**CENTURY FEDERAL, INC., a California Corporation, Plaintiff,**

v.

**CITY OF PALO ALTO, CALIFORNIA, a Municipal corporation; City of Palo Alto Utilities, a Municipal utility; City of Menlo Park, California, a Municipal corporation; and City of Atherton, California, a Municipal corporation, Defendants.**

**No. C-85-2168 EFL.**

United States District Court, N.D. California.

Dec. 3, 1986.

---

Harold R. Farrow, Farrow, Schildhause, Wilson & Rains, Oakland, Cal., for plaintiff.

Jerome B. Falk, Jr., Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., for Palo Alto and Atherton.

John R. Cosgrove, Jorgenson, Cosgrove, Siegel & McClure, Menlo Park, Cal., for Menlo Park.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

LYNCH, District Judge.

This action involves an aspiring cable television operator's first amendment challenge to the defendant municipalities' use of an exclusive franchising arrangement to limit to one the number of cable operators granted access to those facilities necessary to install cables within the defendants' boundaries. Plaintiff now moves for an order granting partial summary judgment

on the issue of liability, asking this Court to hold as a matter of law that such a government-imposed restriction on the number of cable speakers is facially invalid under the first amendment. After considering oral argument and reviewing the extensive briefs and exhibits filed on both sides, this Court hereby grants plaintiff's motion for partial summary judgment. In doing so, the Court holds only the following: First, that under the undisputed facts of this case, the insignificant, if any, increase in disruption to the public domain resulting from the initial installation of more than one cable system, as opposed to a single system, does not constitute a substantial or important governmental interest so as to justify the suppression of all cable speakers except the one to which the municipalities grant permission to speak; and second, that because cable television is more closely analogous to newspapers than the broadcast media, the fact that the cable television market in a proposed service area is a natural monopoly does not justify greater governmental regulation of cable operators than would otherwise be allowed under the first amendment.[1]

## I. *Background*

Plaintiff Century Federal, Inc., is an aspiring cable television (hereinafter "CTV") operator. The defendants (hereinafter "the Cities") are three California municipalities, Atherton, Menlo Park, and Palo Alto, and a utility company owned by Palo Alto. Plaintiff attempted to enter the CTV business in each of the Cities, but was refused a business license and was told that it must participate in the franchise selection process conducted by Palo Alto on behalf of all the Cities. Plaintiff also sought permission to use the utility poles owned by the Pacific Telephone and Telegraph Company, the Pacific Gas and Electric Company, and the defendant City of Palo Alto Utilities, but was refused "pole attachment services" because it had no CTV operating franchise.[2]

The franchise selection process conducted by the Cities had two parts. First, the Cities issued a Request for Proposals (hereinafter "RFP"). This document specified the minimum requirements that an applicant must meet in order to be considered for a franchise.[3] The RFP also requested certain technical, construction, ownership, and financial information concerning the applicant and its proposed system. The Cities planned subsequently to evaluate the applicants in a number of categories, including service and rates, technical/construction, financial, local commitment, and ownership/structure.

The second phase of the selection process involved negotiations with one or more of the so-called most qualified applicants. Although the RFP guidelines expressly referred to the granting of a "nonexclusive" franchise, implying that the Cities might grant a franchise to more than one CTV operator, it is undisputed that the Cities intended to grant a franchise to only one operator, at least initially. *See Central Telecommunications, Inc. v. TCI Cablelevision, Inc.,* 800 F.2d 711, 712 n. 1 (8th Cir.1986) (under a similar RFP, court refers to such franchises as "de facto exclusive").

Of the four CTV operators who answered the RFP, which did not include plaintiff, the Cities targeted two for further negotiations. On October 7, 1985, the Cities awarded a franchise to Cable Coop, which,

1. Although plaintiff's complaint on its face challenges the very existence of the Cities' franchising process, including the minimum requirements a cable television operator must meet before being eligible for a franchise, *see infra* note 3, on this motion the Court expresses no opinion on any aspect of the franchising process other than that part which limits to one the number of operators initially granted access to the facilities necessary for the installation of a cable system.

2. Section 53066 of the California Government Code authorizes municipalities to license or franchise the construction of CTV systems using public property and easements. *Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d 1396, 1400 (9th Cir.1985), *aff'd,* —— U.S. ——, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986).

3. An opinion published earlier in this case, *Century Federal, Inc. v. City of Palo Alto,* 579 F.Supp. 1553 (N.D.Cal.1984), lists in detail the minimum requirements set forth in the RFP. *Id.* at 1554 n. 3.

at least up until the date of oral argument on this motion, had not yet begun to install its CTV system.

Rather than participate in the RFP, plaintiff originally filed suit in this Court in September 1983, alleging that the franchising process as a whole violated the antitrust laws and the first amendment. *See Century Federal, Inc. v. City of Palo Alto,* 579 F.Supp. 1553 (N.D.Cal.1984). On the antitrust claims, the Court granted defendants' motion to dismiss on the ground that the defendant municipalities were immune from liability for the challenged conduct. *Id.* at 1561. The Court denied the Cities' motion on the first amendment claims, however, finding that plaintiff's pleadings alleged a cognizable constitutional deprivation that gave rise to significant factual questions that could not be resolved on the pleadings alone. *Id.* at 1565.

Subsequent to the above rulings, in January 1985, in response to the passage of the Cable Communications Policy Act of 1984, 47 U.S.C. sections 521–611 (Supp.1986), this Court dismissed plaintiff's original first amendment claims without prejudice.[4]

In early March 1985, however, the Ninth Circuit decided *Preferred Communications, Inc., v. City of Los Angeles,* 754 F.2d 1396 (9th Cir.1984), *aff'd,* —— U.S. ——, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986) (hereinafter *"Preferred I "*). Reversing in part the district court's granting of a motion to dismiss, the Ninth Circuit held in a wide-ranging opinion that a municipality could not "limit access by means of an auction process to a given region of [a] City to a single cable television company, where the public utility facilities and other public property in that region necessary to the installation and operation of a cable television system are physically capable of accommodating more than one system[.]" *Preferred I,* 754 F.2d at 1411.

Within a few days after the release of the Ninth Circuit's decision, plaintiff filed the instant action, reasserting its first amendment claim.[5] The parties stipulated that the pleadings and record of the prior action would be considered a part of this new action.

After the United States Supreme Court granted certiorari on the *Preferred I* decision, this Court stayed the disposition of the instant action pending the Supreme Court's decision. In *City of Los Angeles v. Preferred Communications, Inc.,* —— U.S. ——, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986) (hereinafter *Preferred II* ), the Supreme Court affirmed the judgment of the Ninth Circuit "on a narrower ground," *id.* 106 S.Ct. at 2036, holding only that a CTV operator "seeks to engage [in activities that] plainly implicate the First Amendment," *id.* at 2037, and refusing to decide the applicable first amendment standard solely on the pleadings. *Id.* The Court left open the question of "whether the characteristics of cable television make it sufficiently analogous to another medium to warrant application of an already existing standard or whether those characteristics require a new analysis." *Id.* at 2038 (Blackmun, J., concurring).[6]

---

**4.** This Court had hoped that the Communications Policy Act would resolve this litigation. The Act was intended to establish a comprehensive national CTV policy and envisions a franchising arrangement such as that proposed by the Cities. *See Preferred I,* 745 F.2d at 1400 n. 3. The constitutionality of that Act is not being directly challenged in this litigation, but the Ninth Circuit has called into question the constitutionality of a number of its provisions in strong dicta in the *Preferred I* decision. *See id.* at 1401 n. 4, 1411 n. 14.

**5.** In its earlier complaint, plaintiff also alleged a violation of the California constitution, but the parties did not assert any differences between plaintiff's rights under the first amendment and under the state constitution. *Century Federal,* 579 F.Supp. at 1554 n. 1. In the instant action, plaintiff's complaint includes a challenge under the California constitution, but nearly all of the parties' discussion has focused upon the first amendment. Because this Court has found a violation of the first amendment, we do not reach the state constitutional issues.

**6.** The parties have disputed the precedential effect of the Ninth Circuit's *Preferred I* decision in light of the Supreme Court's holding, particularly with regard to the Court's remark that is was affirming on a "narrower ground." *Preferred II,* 106 S.Ct. at 2036. To date, it appears that the Ninth Circuit interprets the Supreme Court's

Two weeks after the Supreme Court's decision, plaintiff filed the instant motion for partial summary judgment. Essentially, plaintiff's position is that the suppression of all cable speakers except one cannot be justified by any important or substantial governmental interest.[7] The Cities, on the other hand, propose five interests that are furthered by a franchising process that allows access to only one CTV system:[8] 1) minimizing disruption of the public domain; 2) promoting first amendment values by ensuring that their residents, who allegedly live in a market that will economically support only one CTV operator (i.e., a natural monopoly), will receive cable service from that CTV operator that will provide the most reliable and highest quality service; 3) preventing "cream skimming," which is the wiring of only affluent, and therefore more profitable, portions of the franchise area; 4) ensuring community and commercially-leased access channels; and 5) encouraging the development of state-of-the-art cable systems with adequate channel capacity.

## II. *Standard of Review on a Motion for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Consequently, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* — U.S. —, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). The Supreme Court has described the district court's review of the

---

holding as an affirmation that is binding on the lower courts of this Circuit. *See Pacific West Cable Co. v. City of Sacramento,* 798 F.2d 353, 355 (9th Cir.1986) (citing *Preferred I* as affirmed by the Supreme Court). The more difficult question is discerning which parts of the Ninth Circuit's opinion are essential to its holding and which parts are dicta. *See Tele-Communications of Key West v. United States,* 757 F.2d 1330, 1338 n. 3 (D.C.Cir.1985) (expressing uncertainty on the "precise basis" for the Ninth Circuit's opinion in *Preferred I* ).

**7.** The reference to "important or substantial" government interests is based on the second step of the *O'Brien* test, *O'Brien v. United States,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), which, as explained below, the Court finds determinative in the disposition of this motion. The Ninth Circuit also refers to such interests as "legitimate." *Preferred I,* 754 F.2d at 1406.

**8.** The Cities dispute the characterization of the franchising scheme as restricting access to only one CTV operator on the ground that the mandatory commercial access channels provided by the chosen franchisee will guarantee to other nonfranchised CTV operators an opportunity to "speak" to the Cities' residents. Such a contention, however, is based on the faulty premise that the first amendment allows the government to infringe on the free speech rights of a speaker based on a possibility that there are alternative avenues of communication available to reach the desired audience. "[O]ne is not to have the exercise of his liberty of expression in an appropriate place abridged on the plea that it may be exercised in some other place." *Schneider v. State,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939). Furthermore, a franchised operator might have use of as many as fifty or more channels on its own system, but a nonfranchised operator as few as one under a commercial access program.

In a separate opposition brief, defendant Menlo Park objects to the characterization on a different basis. Breaking from the other defendants, Menlo Park concedes that under the Ninth Circuit's *Preferred I* decision "it may lack authority to artificially limit to *one* the number of cable operators in Menlo Park." Defendant Menlo Park's Memorandum in Opposition, p. 3 (emphasis in original). Menlo Park claims that it is not attempting to limit to one the number of CTV operators in Menlo Park, but only seeks a "limited right" in a potential natural monopoly market to decline issuing additional franchises until its chosen operator has had the "reasonable opportunity to establish service." *Id.* at 1-2. Of the various weaknesses inherent in Menlo Park's position, the most compelling is that, if this Court finds that the intitial restiction violates the first amendment (as we do), Menlo Park's argument is tantamount to claiming that the immediate Constitutional infirmities of its regulation are somehow cured retroactively by a subsequent change in the process that will make it Constitutional at that later time.

facts as a two-step process. First, the court must determine whether a particular fact is material, that is, a fact that will affect the outcome of the suit under the applicable substantive law. *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* Second, if a fact is material, the court must determine if the dispute about the material fact is "genuine," that is, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Accordingly, this Court's initial inquiry must be on the materiality of the various factual questions. In the instant case, the Court must review each of the governmental interests alleged by the Cities and determine which of these, if any, the substantive law recognizes as important or substantial so as to justify the resultant impact on the first amendment rights of potential CTV operators. Only after a determination that an interest is important or substantial can the Court reach the issue of whether genuine issues of fact exist on the question of whether the franchising process "furthers" that interest.[9]

### III. *Cable Television and the First Amendment*

██ The United States Supreme Court has left no doubt that a CTV operator is a speaker entitled to first amendment protection. *Preferred II,* —— U.S. ——, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986). The Court did not state, however, the degree of protection to which a CTV operator is entitled or the amount of governmental regulation of that medium permissible under the first amendment. The threshold issue on this motion, therefore, is whether the first amendment allows the government the same wide latitude in regulating the CTV industry as it allows in the broadcast medium, *see Red Lion Broadcasting Co., Inc.*

*v. Federal Communications Commission,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *National Broadcasting Co. v. United States,* 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943), or whether the degree of protection should be closer to that enjoyed by the traditional media, such as newspapers.[10] *See Miami Herald v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974).

As defendants' lead counsel admitted at oral argument, if this Court were to apply the same degree of protection that more traditional forms of the media receive, the Cities' restriction on access to its residents obviously would violate the first amendment. We recognize that "differences in the characteristics of new media justify differences in the First Amendment standards applied to them." *Red Lion,* 395 U.S. at 386, 89 S.Ct. at 1805. Application of a lesser standard of protection, however, is an exception to the rule that must be justified by a particular difference. When the Supreme Court was faced with the question of whether a lesser first amendment standard applied to films, it stated that "the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary. Those principles, as they have frequently been enunciated by this Court, make freedom of expression the rule. There is no justification in this case for making an exception to that rule." *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 503, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952). Consequently, in developing the first amendment standard to be applied in this case, the question becomes whether there are any differences in the characteristics of the CTV medium that justify a lesser standard of protection for it that would allow a correspondingly greater degree of governmental regulation.

---

9. For example, because the law recognizes disruption to the public domain as an important or substantial governmental interest, *see Preferred I,* 754 F.2d 1406, this Court must determine whether genuine issues of fact exist on the amount of disruption that will occur if the Cities' franchising scheme initially allowed access to more than one CTV operator.

10. As the parties did, the Court will use newspapers as an example of the more traditional forms of public communicators, such as book publishers, public speakers, and pamphleteers, *see Preferred II,* 106 S.Ct. at 2037, that are entitled to a more protective first amendment standard than the broadcasting media.

## A. Lack of Physical Scarcity in the Cable Television Medium

The Ninth Circuit has recognized that the greater degree of governmental regulation of broadcasting rests on the physical scarcity of radiowaves. *Preferred I,* 745 F.2d 1396, 1403 (9th Cir.1985), *aff'd,* — U.S. ——, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986). As this Court noted earlier in the instant case, "the electromagnetic spectrum is simply not physically capable of carrying the messages of all who desire to speak over it. This principle has been reaffirmed many times." *Century Federal, Inc. v. City of Palo Alto,* 579 F.Supp. 1553, 1563 (N.D.Cal. 1984) (citing *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 101, 93 S.Ct. 2080, 2086, 36 L.Ed.2d 772 (1973); *Red Lion,* 395 U.S. at 389, 89 S.Ct. at 1806).

Notwithstanding its application to the broadcast medium, the Seventh and D.C. Circuits have expressly concluded that the "physical scarcity rationale" is irrelevant to an evaluation of government regulation of cable television. *Quincy Cable TV, Inc. v. Federal Communications Commission,* 768 F.2d 1434, 1449 (D.C.Cir.1985) ("[T]he 'scarcity rationale' has no place in evaluating ... cable television."); *Omega Satellite Products v. City of Indianapolis,* 694 F.2d 119, 127 (7th Cir.1982) ("[F]requency interference [is] a problem that does not arise with cable television.").

The opinions from these two Circuits strongly suggest that physical scarcity could never arise in a cable television setting. The Ninth Circuit, however, expressly left open the question of how a municipality should "allocate access to poles and conduits to competing cable systems when these structures are incapable of accommodating all those seeking access," because plaintiff had alleged that space was available and the court assumed that fact to be true. *Preferred I,* 754 F.2d at 1404.

In any event, this Court also finds it unnecessary to address the issue of wheth-

er physical scarcity could ever arise in the CTV medium because defendants admit that there is no physical scarcity in the instant case.[11]

Consequently, the characteristic in broadcasting that justifies increased governmental intrusion in that medium is absent in the instant case.

## B. Natural Monopoly as a Justification

Most of the argument on the instant motion centered around whether the natural monopoly or economic scarcity rationale justified a greater degree of government regulation than allowed in a newspaper context. Although the Ninth Circuit in *Preferred I* briefly commented "[i]n passing" on the natural monopoly argument, it did not decide the issue because the court accepted as true plaintiff Preferred's allegation on the economic feasibility of competition for cable services in the Los Angeles area. *Id.* The court seemed to imply, however, that a natural monopoly would not be a justification for exclusive franchising. *See Central Telecommunications, Inc. v. TCI Cablevision, Inc.,* 800 F.2d 711, 716 (8th Cir.1986) (interpreting the Ninth Circuit's decision as implying this conclusion).

In the instant case, the issue must be confronted because the parties have hotly contested the question of whether the CTV market in the proposed service areas is a natural monopoly. The Cities envision a trial on this economic question, with both sides presenting expert testimony, based upon studies and statistics, opining on the likelihood that the relevant market is a natural monopoly. According to the defendants, if the trier of fact finds that there is a reasonable likelihood that the market is a natural monopoly, then the Cities should be able to institute their franchising scheme.

Before determining whether there is a triable issue of fact on the question, however, this Court must first decide whether

---

**11.** The defendants made no significant argument in favor of the physical scarcity in their briefs, and their lead counsel admitted at oral argument that none in fact existed in this case. Tr. at 21:21–22.

the question is material under applicable substantive law. Defendants concede that if this Court decides that the law applicable to newspapers controls in this case, then the natural monopoly issue is immaterial and cannot defeat plaintiff's motion.

The Cities' argument on the materiality of the natural monopoly rationale is basically as follows: because the CTV market in our service area is a natural monopoly, it shares a characteristic analogous to the physical scarcity trait in the broadcasting medium, which results in an inherent limitation on the number of possible speakers. Such a trait warrants government regulation of the number and identity of the speakers, which ensures the enhancement of first amendment values.

The Supreme Court rejected this economic scarcity rationale in the context of newspapers, however, in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). In striking down a Florida statute that required newspapers to print replies of persons subjected to editorials that assailed their character, the Court rejected the suggestion that purely economic constraints on the number of newspaper voices available in the given community justified otherwise unwarranted intrusions into first amendment rights. *Id.* at 247–56, 94 S.Ct. at 2834–39. This Court is convinced that the first amendment mandates the same conclusion in the instant case.

This Court recognizes that newspapers, the most traditional form of the media, are historically the source of most of the debate on politics and government that lies at the core of first amendment values. *Id.* at 257–58, 94 S.Ct. at 2839–40. Yet, just as a "newspaper is more than a passive receptacle or conduit for news, comment, and advertising," *id.* at 258, 94 S.Ct. at 2840, the Supreme Court has stated that cable operators exercise a "significant amount of editorial discretion regarding what their programming will include." *Preferred II*, 106 S.Ct. at 2037 (quoting *Federal Communications Commission v. Midwest Video Corp.*, 440 U.S. 689, 707, 99 S.Ct. 1435, 1445, 59 L.Ed.2d 692 (1979)); *see also Preferred I*, 754 F.2d at 1410 n. 10 (recognizing that although CTV operators do transmit programs produced by others, they do exercise considerable editorial discretion). Although the Supreme Court stopped just short of equating cable television to more traditional forms of the media, *see Preferred II*, 106 S.Ct. at 2037, the D.C. Circuit has concluded that there is no "meaningful 'distinction between cable television and newspapers.'" *Quincy*, 768 F.2d at 1450 (quoting *Home Box Office, Inc. v. Federal Communications Commission*, 567 F.2d 9, 46 (D.C.Cir.1977)). This Court agrees that "the analogy [of cable television] to more traditional media is compelling." *Quincy*, 768 F.2d at 1450.[12]

12. The *Quincy* court noted the findings of two influential commissions that have reached the same conclusion, quoting one as finding that "[c]able television, by freeing television from the limitations of radiated electro-magnetic waves, creates ... a situation more nearly analogous to that of the [print] press." 768 F.2d at 1450 (quoting SLOAN COMMISSION ON CABLE COMMUNICATIONS, ON THE CABLE 92 (1971)).

Once we get beyond the difference in the burden to the public domain, the Court finds no constitutionally significant distinction between the content and form of the messages delivered by the CTV medium and newspapers. A CTV operator communicates nearly the same variety of information as the *New York Times,* including general news and political commentary on local, state, national, and international issues, religious programming, and entertainment and educational shows. Although most cable programming today is not originated by CTV operators, they exercise the same editorial discretion as the newspaper editors who decide which nationally syndicated columnists to publish. Certainly, a newspaper would not receive less first amendment protection because it published only syndicated columnists and wire stories. Finally, the very RFP at issue in this case evidences a trend toward greater operator involvement in original programming, listing "operator-originated programming" as one of the five types of services that a potential franchisee must be capable of providing. The RFP envisions the franchisee as supplying a fully-equipped broadcast studio and two to three small-scale mobile production units to facilitate the operator's own (and other community-based) programming.

Not all Circuits have agreed with the D.C. Circuit's conclusion that the reasoning in *Miami Herald* applies to render the natural monopoly rationale irrelevant in the cable television context. *Quincy*, 768 F.2d at 1450; *Home Box Office*, 567 F.2d at 46. Defendants cite the Seventh, Eighth, and Tenth Circuits in support of their position that the existence of a natural monopoly is a basis for the limitations on access that the Cities seek to impose. *Central Telecommunications, Inc. v. TCI Cabletelevision, Inc.*, 800 F.2d 711 (8th Cir.1986); *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119 (7th Cir.1982); *Community Communications Co. v. City of Boulder*, 660 F.2d 1370 (10th Cir.1981), *cert. denied*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982). This Court finds these decisions unpersuasive, however, because each lacks a thorough analysis on the relationship between the proposed regulation and the characteristics of the CTV medium, which analysis we believe is now mandated. *See Preferred II*, 106 S.Ct. at 2038.

The most extended discussion of the issue was that of the Tenth Circuit in *Community Communications*, 660 F.2d at 1376–79. The Tenth Circuit distinguished *Miami Herald* by tying the natural monopoly characteristics of the CTV medium to the burden a cable system causes on public utility facilities and streets. Noting that the economic scarcity in *Miami Herald* was "unrelated to the disruptive use of the public domain requiring a government license," *id.* at 1379, the court found that, in contrast, a CTV operator "must significantly impact the public domain in order to operate; without a license, it cannot engage in cable broadcasting to disseminate information." *Id.*

The weakness in the Tenth Circuit's reasoning stems from the lack of a link between a distinctive characteristic of cable television, e.g., the disruption to the public domain, and the proposed government regulation. The fact that a CTV system can potentially disrupt the streets might justify certain government regulations aimed at minimizing such disruption. As the Ninth Circuit noted, however, "[the Tenth Circuit's] statement is too broad. It suggests that simply because cable's disruption of the public domain gives rise to a need for licensing, it would also justify the monopoly the City seeks to create by its auction process." *Preferred I*, 754 F.2d at 1405.

The Seventh Circuit's opinion in *Omega* is similarly unpersuasive. The court acknowledged that "while today most newspaper markets are natural monopolies, no one thinks that entry into those markets could be regulated without creating profound First Amendment problems." *Omega*, 694 F.2d at 128. Nevertheless, the court summarily concluded that the "apparent natural monopoly characteristics of cable television provide ... an argument for regulation of entry." *Id.* at 127–28. The opinion was devoid of any reason why such a characteristic should make any difference in the cable television setting when it does not in the newspaper context.[13] Indeed, the court did not appear to take a definitive stand on the issue, citing the Tenth Circuit in *Community Communications* and concluding only that "[p]robably there are enough differences between cable television and the nontelevision media to allow more government regulation of the former." *Id.* at 128.

Finally, while this motion was under submission, the Cities cited to this Court the recent Eighth Circuit decision in *Central Communications*, 800 F.2d 711. That case involved an existing franchised CTV operator's effort to prevent the city from granting a new exclusive franchise to a competing company. The Eighth Circuit held that the natural monopoly characteristics of defendant city's cable market justified the city's granting of a de facto exclusive franchise to a single CTV operator.

---

**13.** Other than the natural monopoly theory, the court also briefly noted the public disruption argument, *Omega*, 694 F.2d at 127, and the fact that television in general enjoys "universal access to the home," which results in a "felt need to protect children." *Id.* at 128. Again, the court did not link these characteristics to the regulation of the entry of CTV operators.

*Id.* at 717. After reviewing the Supreme Court's *Preferred II* opinion,[14] the court cited and discussed the *Community Communications* and *Omega* decisions in support of the proposition that cable television is more analogous to broadcasting than newspapers, therefore justifying an exclusive franchising scheme.[15] Although "recogniz[ing] that there are profound first amendment implications inherent in the regulation of cable operators," *id.* at 716, the Eighth Circuit similarly failed to explain why a CTV operator should receive less first amendment protection than a newspaper. Cautioning that it would not decide any question not squarely before it, the court considered the natural monopoly question "only in terms of the competing technologies offered" by the two competing CTV operators in the case. *Id.* 716–17. The court then noted that the defendant cable company proposed to provide a more technologically advanced system with far more channels at a lower cost than plaintiff was currently providing. *Id.* at 717. Therefore, although plaintiff had "a first amendment interest in remaining as a cable television 'speaker'," defendant's "proposal went further in advancing the first amendment interests of the viewing public in the greatest variety of programming obtainable." *Id.*

Like the Seventh and Tenth Circuits, the Eighth Circuit did not explain which characteristics of the CTV medium justify application of less protection than afforded to the nonbroadcasting media. Clearly, the first amendment will not tolerate the government's suppression of speakers, even on a content-neutral basis, in the newspaper, movie, and book industries on the ground that the one speaker granted access provides the greatest variety of articles, movies or publications at the lowest price. It is also clear under *Miami Herald* that the fact that the newspaper, movie or book markets in a given community are a natural monopoly does not justify greater governmental regulation of such first amendment speakers.

In an age when most people receive their daily news via the television, that medium has established a role as critical to the free flow of ideas and information in this society as any of the more traditional media. The physical scarcity that justified the government's unparalleled intrusion into the broadcasting medium simply does not exist in this case. The Supreme Court has always stressed that "[e]ach medium of expression ... must be assessed for First Amendment purposes by standards suited to it...." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975). As a result, a

**14.** The Eighth Circuit read the Supreme Court's opinion as "suggest[ing] that the cable medium may be distinguished from the newspaper medium and that more government regulation of a cable medium may be permissible because cable requires use of public ways and installation of cable systems may disrupt public order." *Central Telecommunications*, 800 F.2d at 714. This Court reads *Preferred II* as definitely holding only that the CTV medium may be distinguishable from the newspaper medium *because* of the greater disruption to the public domain that can result with the former. The Supreme Court in fact did not suggest that the fact that cable television might disrupt public resources somehow justifies government regulation unrelated to this characteristic.

**15.** The Eighth Circuit's opinion lacks any discussion of the D.C. Circuit's clear position to the contrary enunciated in *Home Box Office*, 567 F.2d 9, and *Quincy*, 768 F.2d 1434. In fact, *Central Telecommunications* incorrectly implies that the D.C. Circuit's position is in accordance

with the Seventh and Tenth Circuits. The court cites *Tele-communications of Key West v. United States*, 757 F.2d 1330 (D.C.Cir.1985), as support for the proposition that "[t]he apparent natural monopoly characteristics of cable television ... provide an argument for regulation of entry." *Central Telecommunications*, 800 F.2d at 716 (quoting *Omega*, 694 F.2d at 126–27). In fact, the issue of natural monopoly was never raised in the *Key West* opinion. In a parenthetical, the Eighth Circuit characterizes the *Key West* decision as "[h]olding that if caole company could show that there were no practical reasons why two cable operators could not serve Air Force base, Air Force's exclusive franchising scheme would violate the first amendment." *Id.* at 716 (citing *Key West*, 757 F.2d at 1338). This Court reads "practical reasons" as referring to circumstances such as the physical burden on the Air Force base, not to market conditions. *See Key West*, 757 F.2d at 1335–36.

particular characteristic of a given form of expression can only justify government regulation aimed at addressing that particular characteristic. Although the fact that cable television places a heavier burden on the public domain than more traditional forms of the media may justify some government regulation of that burden, the defendant Cities as a matter of law have failed to persuade this Court that there are any other differences attributable to cable television that can justify a degree of first amendment protection similar to that applied to the broadcast medium.

### IV. *Application of the O'Brien Test*

Concluding that the allowable degree of governmental regulation is not fixed by physical or economic scarcity does not mean that all regulation of CTV operators is invalid. *Preferred I,* 754 F.2d 1396, 1405 (9th Cir.1985), *aff'd,* — U.S. ——, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986). The first amendment allows some government regulations of noncommunicative aspects of speech. *Id.* As the Supreme Court has noted, "where speech and conduct are joined in a single course of action, the First Amendment values must be balanced against competing societal interests." *Preferred II,* — U.S. ——, 106 S.Ct. 2034, 2038, 90 L.Ed.2d 480 (1986) (citing *Members of the City Council v. Taxpayers for Vincent,* 466 U.S. 789, 805–07, 104 S.Ct. 2118, 2129–30, 80 L.Ed.2d 772 (1984); *United States v. O'Brien,* 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968)).

The propriety of governmental regulations of noncommunicative aspects of speech is judged by the standard enunciated in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672.[16] Under the *O'Brien* test, a regulation is constitutional only if (1) it is within the constitutional power of the government; (2) it furthers an important or substantial governmental interest; (3) the governmental interest is unrelated to the suppression of free speech; and (4) the incidental restriction on first amendment freedom is no greater than essential to further that interest. *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. The defendant Cities bear the burden of proving that the elements of this test are satisfied. *Preferred I,* 754 F.2d at 1406 n. 9; *Playtime Theaters, Inc. v. City of Renton,* 748 F.2d 527, 535 (9th Cir.1984), *rev'd on other grounds,* — U.S. ——, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).

To reiterate, the only government regulation addressed on this motion is that part of the Cities' franchising process that limits to one the number of CTV operators given access to the facilities necessary to install a cable system.

As to the first step of the *O'Brien* test, this Court finds that, as a matter of law, a franchise arrangement is within the Cities' constitutional power of government.[17] Because the second step, whether the regulation furthers an important or substantial governmental interest, is determinative on the instant motion, the Court finds it unnecessary to reach a decision on whether there are genuine issues of material fact under the third and fourth steps.

As noted earlier, the Cities have alleged five interests to satisfy the second

---

**16.** The parties disagreed as to what the appropriate test should be in this case. The Court notes, however, that *O'Brien* was applied by the Ninth Circuit in *Preferred I,* 754 F.2d at 1405–07, and cited by the Supreme Court in *Preferred II,* 106 S.Ct. at 2038. Additionally, plaintiff argued that the *O'Brien* test was inappropriate because the RFP process was not content-neutral. We hold for the purposes of this motion only that the regulation at issue is applied in content-neutral fashion, but note the Ninth Circuit's finding that "allowing only a single company selected through the franchise process to erect and operate a cable system in the region ... creates a serious risk that city officials will discriminate among cable providers on the basis of the content of, or views expressed in, their proposed programs." *Preferred I,* 754 F.2d at 1406. This in fact appears to be the basis upon which the Ninth Circuit found that the *O'Brien* test was not met. *See id.* at 1406–07.

**17.** California Government Code section 53066 expresses a clear legislative intent on the part of the California legislature to delegate government regualtion over CTV operators to local governments. *Preferred I,* 754 F.2d at 1413.

step of the *O'Brien* test: (1) minimizing disruption of the public domain; (2) promoting first amendment values by ensuring that their residents receive CTV service from that operator who will provide the most reliable and highest quality service; (3) preventing "cream skimming," which is the wiring of only affluent, and therefore more profitable, portions of the franchise area; (4) ensuring community and commercially-leased access channels; and (5) encouraging the development of state-of-the-art cable systems with adequate channel capacity. This Court finds as a matter of law that, of these five interests, only the facts underlying the first, disruption to the public domain, are material so as to warrant consideration on this summary judgment motion. As to the last four, none state an important or substantial governmental interest that would justify the severe impact on the first amendment rights of all potential CTV operators except the one given access.[18] It is to these last four alleged interests that the Court will first turn.

These four interests are inherently related to the natural monopoly rationale. Essentially, the Cities argue that if there is a reasonable probability that their service area will economically support only one CTV operator, then they should be able to choose, at the outset, that operator who will provide the highest quality service and use the offer of an exclusive franchise as a plum to bargain for certain concessions, e.g., access channels, that they might not be able to acquire if an operator knew that it would have to compete with other cable providers. The existence of a state-of-the-art CTV operator that provides quality service, including community and commercial access channels, to all areas within their boundaries best ensures, the Cities argue, that the values of the first amendment will

be furthered because the Cities' residents will have expanded opportunities to receive diverse sources of information.

The Cities' position is analogous to one taken by municipalities defending antitrust suits by cable operators. They have argued, as cities have successfully done with such industries as water and electricity, that regulation of natural monopolies maximizes economic efficiency, and consequently, consumer welfare. Judge Posner of the Seventh Circuit explains this reasoning in the CTV setting:

"[I]n a 'natural monopoly' ... the benefits, and indeed the very possibility, of competition are limited. You start with a competitive free-for-all ... but eventually there will be only a single company, because until a company serves the whole market it will have an incentive to keep expanding in order to lower its average costs. In the interim there may be wasteful duplication of facilities. This duplication may lead not only to higher prices to cable television subscribers, at least in the short run, but also to higher costs to other users of the public ways.... An alternative procedure is to pick the most efficient competitor at the outset, give him a monopoly, and extract from him in exchange a commitment to provide reasonable service at reasonable rates."

*Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 126 (7th Cir. 1982).

The Cities essentially argue that the same is true in the context of the first amendment. Just as the regulation of water and electric companies—or CTV operators as the case may be—enhances consumer welfare through economic efficiency, the regulation of CTV operators furthers the purposes of the first amendment. But in

---

**18.** In applying the second step of the *O'Brien* test, the Supreme Court applies a balancing test, asking whether the alleged governmental interest is sufficiently substantial to justify the resultant impact on free expression. *See, e.g., Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984).

The Cities argued these same alleged interests in their amicus brief to the Ninth Circuit in *Preferred I*, to which the court responded in a footnote: "We are not convinced that restricting the number of cable operators in the manner set forth in ... [Preferred's] complaint furthers these interests in a manner consistent with the First Amendment." 754 F.2d at 1406 n. 9.

this case, what may foster economic efficiency most certainly inhibits the first amendment.

The paternalistic role in the first amendment that the Cities envision for government is simply inconsistent with the purpose and goals of the first amendment. The Cities nevertheless contend that such a role is consistent with the Supreme Court's often-cited passage that, under the first amendment, it is the rights of viewers and listeners that is paramount, not the rights of speakers. *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969). We disagree. In fact, the rationale of the Court is just the opposite. The Court proceeds to explain in *Red Lion* that because the viewers' rights are paramount, "the purpose of the First Amendment [is] to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail, rather than to countenance monopolization of the market...." *Red Lion*, 395 U.S. at 390, 89 S.Ct. at 1806. Elsewhere, the Court has explained that the Constitution "command[s] that government itself shall not impede the free flow of ideas...." *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 252, 94 S.Ct. 2831, 2837, 41 L.Ed.2d 730 (1974) (quoting *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 1425, 89 L.Ed.2d 2013 (1945)). We reach our conclusion with the first amendment interests of the Cities' residents foremost in mind, for their rights are endangered by a governmental attitude that government knows best how to fine tune the flow of information to which they have access. Furthermore, this Court agrees with the Ninth Circuit in *Preferred I* that such governmental intrusion carries with it the inherent risk of covert discrimination against certain CTV operators. *See supra* note 16.

Consequently, the factual questions presented by the Cities on the above four alleged interests are immaterial under the applicable substantive law, and therefore, cannot give rise to issues of fact that can defeat plaintiff's motion for summary judgment.

■ The analysis is different, however, on the Cities' first alleged interest, disruption to the public domain. In *Preferred I*, the Ninth Circuit recognized that a "City has legitimate interests in public safety and in maintaining public thoroughfares." *Preferred I*, 754 F.2d at 1406; *see also Community Communications Co. v. City of Boulder*, 660 F.2d 1370, 1377 (10th Cir. 1981), *cert. denied*, 456 U.S. 1001, 102 S.Ct. 2287, 73 L.Ed.2d 1296 (1982) ("A city needs control over the number of times its citizens must bear the inconvenience of having its streets dug up and the best times for it to occur.") Additionally, the fact that a cable system burdens public resources is a characteristic of the medium not shared with traditional media such as newspapers. Therefore, even when applying to CTV operators the same first amendment standard applied to newspapers, the allowable governmental regulation must still be viewed in light of those important or substantial governmental interests specifically implicated by the noncommunicative aspects of the CTV medium.

The above finding that, under the applicable substantive law, the Cities have an important or substantial governmental interest in minimizing disruption to the public domain does not end the inquiry. For purposes of this motion, the Court next must determine whether the Cities have offered sufficient evidence to create a geniune issue of fact on the question of whether the proposed limitation on access "furthers" that governmental interest. *See O'Brien*, 391 U.S. at 377, 88 S.Ct. at 1679 (the second step is whether the challenged regulation "furthers" an important or substantial governmental interest). That is, have the Cities offered sufficient evidence on the degree of disruption that will result if they initially allow more than one CTV operator to lay cables?

Both sides presented exhaustive evidence on the disruption that results from the installation and maintence of cable systems, which run underground and on telephone poles. The Cities presented declara-

tions from their experts on everything from the danger posed to other cable lines to the likely increase in the number of complaints the Cities will receive regarding remiss CTV workers who leave backyard gates open for opportunistic family pets.[19]

The Cities made no showing, however, on how much more disruptive granting access to more than one CTV system would be when multiple systems are installed simultaneously as opposed to the installation of a single system. What is at issue here is a facial challenge to a franchising scheme that grants access to the first CTV operator to lay cables within a particular service area. Consequently, the Cities cannot justify a limitation to one on the ground that, in general, a CTV system is disruptive to the public domain. The Cities are willing to allow the installation of the first system. The question must then become: how is the government's interest in the public domain effected if access is granted initially to more than one system? To this, the Cities provide no answer.

The Cities address this issue only by arguing that unless two or more CTV systems are installed simultaneously, the disruptive burden will be increased whenever more than one system is constructed within the same service area. *See* Defendants Palo Alto and Atherton's Memorandum in Opposition, pp. 17–18. This may be so. But such a contention is incongruous to the facts of this case because when the RFP was issued no cables had previously been installed, the Cities intended to allow installation of one system, and simultaneous installation of multiple systems was possible. This is not a case in which one system has already been fully installed and another CTV operator subsequently seeks to install another system over the same public do-

main. If disruption can be minimized by simultaneous installation, then what prevents the Cities from taking advantage of that fact with proper time, place, and manner restrictions? Indeed, plaintiff has stated that requiring simultaneous installation would be a valid government regulation. *See* Plaintiff's Reply Memorandum, pp. 13–14.[20]

■ Because the Cities have made no showing that initially allowing access to more than one operator will implicate or "further" their important or substantial interest in regulating disruption to the public domain, this Court finds that, as a matter of law, there are no genuine issues of material facts under the second step of the *O'Brien* test.

### V. *Conclusion*

We have not intended to suggest in this decision, nor do we read the Ninth Circuit's *Preferred I* opinion as holding, that the Cities necessarily have to open their cable facilities to all comers regardless of size, shape, quality or qualifications. *Accord Pacific West Cable Co. v. City of Sacramento,* 798 F.2d 353, 355 (9th Cir.1986). We have not needed to reach the issue of permissible minimum requirements that the Cities might impose on all franchisees. This Court only holds on this motion that the Cities have not offered sufficient evidence to create a genuine issue of material fact on the question of whether there is a substantial or important governmental interest to justify limiting to one the number of CTV operators granted access to the facilities necessary for the installation and maintenance of a cable system. Therefore, under the undisputed facts of this case,

**19.** For example, the Cities submit expert declarations stating that the trenching necessary to install a cable system underground carries with it such risks as damaging other utility services, destroying the physical integrity of the road surface in which trenching is performed, injuring vehicles using the streets, delaying resurfacing of the Cities' roadways, adversely impacting local business, interfering with vehicular, pedestrian, and bicycle traffic, and damaging or obstructing property. Defendants Palo Alto and

Atherton's Memorandum in Opposition, pp. 17–18 n. 17.

**20.** We do not express an opinion on the issue of whether the public disruption interest could ever justify the total ban on a particular CTV operator's installation of any of its own cables, but the Ninth Circuit's *Preferred I* opinion seems to suggest that it could not. 754 F.2d at 1406.

that part of the Cities' RFP that imposes such a restriction is unconstitutional on its face.

According to the Cities, their entire franchising scheme depended upon limiting initial access to one CTV operator. Therefore, the Court is now unsure as to what, if any, issues in this case are still unresolved other than damages. Accordingly, the Court orders that a status conference in this case be held at 3:30 p.m. on February 4, 1987. The Court further orders that three weeks prior to that date, plaintiff file a status conference statement listing the remaining issues in this case. One week thereafter, the defendant is to file its version of the same status conference statement.

IT IS SO ORDERED.