**CENTURY FEDERAL, INC., a California corporation, Plaintiff,**

v.

**CITY OF PALO ALTO, a municipal corporation, City of Palo Alto Utilities, a municipal utility, City of Menlo Park, a municipal corporation, and City of Atherton, a municipal corporation, Defendants.**

No. C–85–2168 EFL.

United States District Court, N.D. California.

Oct. 12, 1988.

Robert M. Bramson, Farrow, Schildhause, Wilson & Rains, Walnut Creek, Cal., for plaintiff.

Dirk M. Schenkkan, Howard, Rice, Nomerovski, Canady, Robertson & Falk, San Francisco, Cal., Jorgenson, Cosgrove, Siegel & McClure, Menlo Park, Cal., for defendants.

ORDER—GRANTING PARTIAL SUMMARY JUDGMENT IN PART AND DENYING PARTIAL SUMMARY JUDGMENT IN PART

LYNCH, District Judge.

The Court has issued a number of opinions in this case and it is therefore unneces-

sary again to set forth a detailed recitation of the background of this litigation. *See Century Federal, Inc. v. City of Palo Alto*, 579 F.Supp. 1553 (N.D.Cal.1984) [hereinafter *Century Federal I*], *further proceeding*, 648 F.Supp. 1465 (N.D.Cal. 1986) [hereinafter *Century Federal II*], *further proceeding*, No. C–85–2168 (N.D. Cal. Sept. 1, 1987) [hereinafter *Century Federal III*]. It is sufficient here to recall that the Court has found that cable television operators such as plaintiff Century Federal are entitled to first amendment protections that are more analogous to those enjoyed by traditional press media such as newspapers than to the much more circumscribed protections accorded broadcast media such as radio and orthodox television. The Court has accordingly determined numerous aspects of the municipal defendants' challenged franchising scheme for cable television[1] to be in violation of the first and fourteenth amendments, most notably because it unjustifiably provided for the granting of a monopoly franchise to one cable company, thereby preventing Century Federal from exercising its rights to speak. *See Century Federal II*, 648 F.Supp. 1465. The Court has also found unconstitutional franchise provisions regarding 1) "mandatory access channels," which required Century Federal to devote eight of its channels to the speech of others; 2) "universal service," which required plaintiff to speak where the municipal defendants decreed rather than where it chose to; and 3) "state-of-the-art" technology, which required Century Federal to use cable technology of the Cities' choosing. *See Century Federal III*, No. C–85–2168, at 3–12.

The cross-motions for partial summary judgment now before the Court are for a determination of which of the financial requirements of defendants' franchising scheme are permissible under the first and fourteenth amendments. Plaintiff Century Federal challenges as unconstitutional and unreasonable four of defendants' financial requirements: 1) an annual "franchise fee" of five percent of plaintiff's gross receipts as a cable operator; 2) construction and performance bonds; 3) a "security fund"; and 4) charges for defendants' costs in developing and administering the franchise scheme. The Court will address each of the financial requirements in turn below.

## I

## FRANCHISE FEE

The motions regarding the franchise fee present the general question under what circumstances a municipality may charge a first amendment speaker for speech activity within the municipality's jurisdiction. First, it is of course true that government may not tax or otherwise charge a speaker simply for exercising its constitutional right to speak. As the Supreme Court found in striking a municipality's ordinance requiring the licensing of door to door solicitors:

> A state may not impose a charge for the enjoyment of a right granted by the Federal Constitution.... The power to impose a license tax on the exercise of [first amendment] freedoms is indeed as potent as the power of censorship which this Court has repeatedly struck down.

*Murdock v. Pennsylvania*, 319 U.S. 105, 113, 63 S.Ct. 870, 875, 87 L.Ed. 1292 (1943) (citations omitted); *see also, e.g., id.* at 110–117, 63 S.Ct. at 873–77; *Cox v. New Hampshire*, 312 U.S. 569, 576–78, 61 S.Ct. 762, 766–67, 85 L.Ed. 1049 (1941); *Jacobsen v. Crivaro*, 851 F.2d 1067, 1071 (8th Cir. 1988); *Gannett Satellite Information Network v. Metropolitan Transportation Authority*, 745 F.2d 767, 774 (2d Cir.1984); *Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050, 1056 (2d Cir.1983) [hereinafter *ECCAG*]; *Fer-*

---

**1.** The original defendants in this case were the City of Palo Alto and its municipal utilities and the municipalities of Atherton and Menlo Park, which had collaborated in the franchising scheme. Pursuant to Federal Rule of Civil Procedure 68, defendant Menlo Park offered and plaintiff accepted judgment on October 9, 1987, which the Court entered on October 13, 1987. Menlo Park is accordingly no longer a party to this action. The remaining defendants shall sometimes be referred to collectively as the "Cities" and the primary defendant, Palo Alto, referred to as the "City."

*nandes v. Limmer,* 663 F.2d 619, 633 (5th Cir.1981), *cert. dismissed,* 458 U.S. 1124, 103 S.Ct. 5, 73 L.Ed.2d 1395 (1982); *Baldwin v. Redwood City,* 540 F.2d 1360, 1370–72 (9th Cir.1976), *cert. denied sub nom. Leipzig v. Baldwin,* 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977); *cf. Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 586 n. 9, 103 S.Ct. 1365, 1372 n. 9, 75 L.Ed.2d 295 (noting tension between certain aspects of *Murdock* line of cases and *Breard v. Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951)); *Project 80's, Inc. v. City of Pocatello,* 857 F.2d 592, 594–95 (9th Cir. 1988) (distinguishing *Breard* as predating modern recognition that commercial speech is protected). In light of the Supreme Court's determination that cable television operators' activities "plainly implicate First Amendment interests," *City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 494, 106 S.Ct. 2034, 2037, 90 L.Ed.2d 480 (1986) (affirming on narrower grounds *Preferred Communications, Inc. v. City of Los Angeles,* 754 F.2d 1396 (9th Cir.1985) [hereinafter *Preferred Communications I* ]) [hereinafter *Preferred Communications II* ], as well as this Court's previous rulings in this case, the Cities thus cannot and do not now claim that they are entitled to charge plaintiff for the "privilege" of speaking in defendant municipalities Palo Alto and Atherton;[2] Century Federal has a *right* to do so guaranteed by the first amendment.

This is not to say, however, that Century Federal is immune from all charges and requirements by the Cities. Thus, reasonable fees to help defray the administrative costs of necessary licensing may be permissible. *See, e.g., Cox,* 312 U.S. at 576–78, 61 S.Ct. at 766–67; *Gannett,* 745 F.2d at 774; *ECCAG,* 723 F.2d at 1056; *Baldwin,* 540 F.2d at 1371–72. The widely applicable principle "in determining the constitutionality of [a] license tax is whether the [municipality] has given something for which it can ask a return." *Murdock,* 319 U.S. at 115, 63 S.Ct. at 876.

Here, although recognizing that the Cities may not tax speech and effectively conceding that they originally viewed the franchise fee as a kind of tax and that the fee was set without regard to defendants' actual costs caused by or value provided to cable operators,[3] the Cities now assert that they are entitled to the franchise fee because it should be viewed as a rent for use of the Cities' property interests in the rights of way over and through which Century Federal's cable must pass.[4]

---

**2.** *See, e.g.,* Defendants' Supplemental Memorandum re Financial Issues at 2–3 [hereinafter Defendants' Supplemental Memorandum]; Transcript of Hearing of November 25, 1987, at 34 [hereinafter Tr.].

**3.** *See, e.g.,* Defendants' Declaration of William Zaner of April 17, 1987, at 3–4 [hereinafter Zaner Declaration I]; Defendants' Statement of Undisputed Facts at 14; Tr. at 22–27. Although the Cities submit the declaration of "a Principal Property Appraiser in the Property Taxes Department of the California State Board of Equalization" as support of the contrary conclusion, it *is difficult to see how it can be viewed as other* than a dramatic indication that government on the state as well as the local level actually considers the franchise fee to be a straightforward tax on the "privilege" of cable operation:

Franchise fees are paid to a municipality based on a predetermined percentage of the [cable television] *operator's gross receipts.* Such fees are for the *privilege* of constructing, operating, and maintaining a [cable television] system in a given locality. They may or may not be in lieu of a business license fee, an occupation tax, or some similar levy. [¶]

The percentage of gross receipts has often been whatever the market would bear.

Defendants' Declaration of Ray Mrotek of October 2, 1987, Exhibit A at [page] AH 568–14 (Assessment Standards Division, Property Taxes Department, California State Board of Equalization, *Assessors' Handbook: The Appraisal of Cable Television* ) (emphasis added).

**4.** Contrary to defendants' assertions, *see, e.g.,* Tr. at 22–27, the franchise fee need not be sustained simply because a rational basis for its enactment may be imagined. As the Supreme Court found in a leading case specifically concerned with cable television:

Where a law is subjected to a colorable First Amendment challenge, the rule of rationality which will sustain legislation against other constitutional challenges typically does not have the same controlling force.

*Preferred Communications II,* 476 U.S. at 496, 106 S.Ct. at 2038 (citation omitted) (rejecting municipality's attempted reliance on *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461–62, 66 L.Ed.2d 368 (1980), and *Schweiker v. Wilson,* 450 U.S. 221, 236–37, 101 S.Ct. 1074, 1084, 67 L.Ed.2d 186

Plaintiff opposes this argument essentially on the grounds that 1) Century Federal's cable will use none of the Cities' property because it will be strung along routes occupied by the telephone company, Pacific Bell, in public rights of way in which the cities allegedly have no property interests; and 2) even if the Cities do have interests in the rights of way where the cable passes, the Cities' franchise fee nevertheless cannot be justified under the first amendment.

■ At the outset of assessing these arguments, the Court is faced with the difficulty that because Century Federal has not constructed or definitively designed its cable system it is not possible to ascertain precisely what areas the system will occupy or what rights the Cities have in those particular locations. Nevertheless, given the representations and evidence submitted by the parties, the narrow issues that the Court addresses are sufficiently concrete and distinct for decision.[5]

Plaintiff presently seeks to use only one class of property in which the Cities claim property interests, the public rights of way, and the parties move only for a determination of the Cities' rights to impose their franchise fee based on their alleged ownership of those rights of way. Moreover, as discussed below, the parties do not dispute the documentary evidence on which they ask the Court to base its decision. It is important to note that the Court is not faced with and does not decide any issue regarding the propriety of charges by the Cities for use of other property they hold nor any issue regarding the rights of Century Federal or others to use the rights of way. In this opinion, the Court addresses solely the issues of the constitutionality of the Cities' financial requirements where Century Federal uses only public rights of way and non-municipal property for its cable system.

### A. *Existence of Municipal Property Interests in the Public Rights of Way*

■ The Cities attempt to justify their franchise fee by asserting that they have property interests in the public rights of way plaintiff seeks to use. Defendants offer uncontroverted evidence of dedications to the public use that are typical of the dedications that define the rights of way throughout the relevant municipality. *See, e.g.*, Defendants' Declaration of William W. Fellman of October 2, 1987, at 2–3, Exhibits B–1, D [hereinafter Fellman Declaration].

Century Federal opposes defendants' assertion that such dedications vest property rights in the Cities, relying principally on *County of Sacramento v. Pacific Gas & Elec. Co.*, 193 Cal.App.3d 300, 313–14, 238 Cal.Rptr. 305 (1987) (citation omitted), in which the California Court of Appeal stated that:

Public utility easements arise from the terms of Government Code section

(1981)—which both sustained legislation because the Supreme Court could conceive of rational reasons for Congress' action—by distinguishing those cases as based on equal protection challenges under fifth amendment rather than on challenges under first amendment); *see also Posades de Puerto Rico Ass'n v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 355, 106 S.Ct. 2968, 2984, 92 L.Ed.2d 266 (1986) (Brennan, J., dissenting) ("[A] court may not, as the [majority] implies today, simply speculate about valid reasons that the government might have for enacting [commercial speech] restrictions."); *cf., e.g., Wilson*, 450 U.S. at 244, 101 S.Ct. at 1088 (Powell, J., dissenting) ("When a legislative purpose can be suggested only by the ingenuity of a government lawyer litigating the constitutionality of a statute, a reviewing court may be presented not so much with a legislative policy choice as its absence. [¶] In my view, the [c]ourt should receive with some skepticism *post hoc* hypotheses about legislative purpose, unsupported by the legislative history." (footnote omitted)). Even assuming, arguendo, that the Cities' proffered "post-enactment justification," Tr. at 27, of the franchise fee as a rent should be credited, as discussed below the fee is nevertheless unconstitutional.

5. Although the Court of course may not render advisory opinions, here it is appropriate to address this somewhat uncertain aspect of the undoubted case or controversy between the parties because it appears necessary in order to resolve the dispute between them. Plaintiff not implausibly insists that it is unable to proceed with the final layout of its cable network until it knows whether it will have to pay five percent of its gross revenues as a franchise fee for locating its cable in the public rights of way.

> 66475,[6] which provides that as a condition of approving a subdivision map a local government may require the subdivider to dedicate real property for public utility easements. Such easements are not granted in the public streets and highways, but are upon the real property purchased by the purchasers of the subdivided lots. Neither the easements nor the servient estate are granted to the [local government]; rather the easements are expressly dedicated to the public utility purposes. It is fundamental that the language of a grant of an easement determines the scope of the easement.... Public utility easements, by their express terms, define the class of persons who have an interest or right in the use of the easement, and these easements do not extend rights to the public in general or to the [local government] in particular. [Defendant utility] is in the class of persons for whom public utility easements were dedicated. Regardless of whatever regulatory rights the [local government] has in public utility easements, [the utility] obtained its rights to use such easements as a member of the class of grantees and not by virtue of its [local government] franchises. Accordingly, the trial court did not err in determining that [the utility] need not pay franchise fees based upon gross receipts arising out of the use of public utility rights of way.[7]

In light of plaintiff's argument it is necessary to examine the proffered evidence regarding property interests in considerable detail.

The most exemplary dedications before the Court are contained on a Palo Alto subdivision blueprint and state as follows:

> [The owners] ... hereby dedicate to public use all the streets, avenues, roads, drives, places and parks as shown upon [the subdivision] map within said subdivision.
>
> We also hereby dedicate for public use easements for public utilities under, on or over those certain strips of land lying between the rear lines and/or side lines of lots and the lines designated as shown on said map as "Utility Easement Line" within said subdivision, such strips of land to be kept open and free from buildings.

Fellman Declaration, Exhibit B-1. On their face, the dedications [8] thus do not expressly grant the contested rights of way to defendant Palo Alto. However, abundant legal authority and undisputed evidence indicates that the dedications should be read as granting such rights of way to the City itself.[9]

6. *See* note 10 *infra.*

7. *See* note 15 and accompanying text *infra.*

8. Under California law, it seems clear that such dedications to public use include easements for cable television systems. *See Witteman v. Jack Barry Cable TV,* 192 Cal.App.3d 1619, 1624–28, 228 Cal.Rptr. 584 (1986), *review dismissed,* 240 Cal.Rptr. 449, 742 P.2d 779 (Cal.1987); *Salvaty v. Falcon Cable Television,* 165 Cal.App.3d 798, 802–05, 212 Cal.Rptr. 31 (1985). As the California Court of Appeal found in *Witteman:*

> "The unsurprising fact that the drafters of the 1922 easements did not envision cable television does not mandate [a] narrow interpretation of the purposes of the conveyance of rights and privileges.... Scientific and technological progress over the ensuing years [has] added an unforeseen dimension to such contemplated benefits, the transmission by electric impulse of visual and audio communication over coaxial cable. It is an inescapable conclusion that the intention of [the dedicators] was the acquisition and continued maintenance of available means of bringing electrical power and communication into the homes of the subdivision. Clearly, it is in the public interest to use the facilities already installed for the purpose of carrying out this intention to provide the most economically feasible and least environmentally damaging vehicle for installing cable systems."

192 Cal.App.3d at 1627–28, 228 Cal.Rptr. 584 (approvingly quoting *Henley v. Continental Cablevision of St. Louis County, Inc.,* 692 S.W.2d 825, 829 (Mo.Ct.App.1985)) (second set of brackets in original).

9. It should be noted that dedications to public use are not narrowly confined by the normal rules of property and contract, and are to be construed broadly in favor of the public. As the United States Supreme Court long ago observed:

> The law applies to [such dedications] rules adapted to the nature and circumstances of the case, and to carry into execution the intention and object of the grantor, and secure to the public the benefit held out, and expected to be derived from and enjoyed, by the dedication.

First, although some of the relevant municipal legislation and regulations are apparently lost to history, it is clear that pursuant to state statute [10] Palo Alto has long required such dedications to be made *to the City.* For example, Palo Alto's current municipal code provides in part as follows:

Required dedications. The subdivider shall dedicate or offer to dedicate *to the city* or other appropriate public agency upon the final or parcel map any and all rights-of-way and easements necessary for the layout, maintenance and operation of all public improvements required or permitted under this title.... Required dedications shall include, but not be limited to:

(a) Easements for public utility, sanitary sewer and drainage purposes, and for the overhead pole lines and anchors required....

. . . . .

(e) The rights-of-way for public streets and alleys approved under this title. Fee title to all public street rights-of-way shall be conveyed *to the city* by separate deed to be recorded with the final or parcel map....

Palo Alto, Cal., Mun.Code § 21.24.010 (1980) (emphasis added) (codifying Palo Alto, Cal., Ordinance No. 3157, § 1 (part) (1979) [hereinafter City Ordinance]) [hereinafter City Code]. To the same effect was Palo Alto's first comprehensive codification of its regulations for subdivision, enacted in 1950:

Easements. The subdivider shall grant easements not less than five feet in width for public utility, sanitary sewer and drainage purposes.... Dedication of easements shall be *to the city* for the purpose of installing utilities, planting strips and for other public purposes as may be ordered or directed by the city council....

City Code § 21.20.100 (1950) (emphasis added) (codifying City Ordinance No. 1316, § 5.20 (Dec. 26, 1950)); *see also id.* §§ 21.-20.010–.080 (codifying City Ordinance No. 1316, §§ 5.11–.17 (concerning dedication of streets, highways, alleys, etc.)). Likewise, the City exercised its authority to require dedication, *see* City Ordinance No. 510 (Aug. 18, 1930),[11] pursuant to one of the state's earliest Subdivision Map Acts, which provided in part that:

Sec. 17. [A subdivision] map shall particularly set forth all parcels of land

---

*City of Cinncinati v. White,* 31 U.S. (6 Pet.) 431, 435, 8 L.Ed. 452 (1832); *see also, e.g., Faus v. City of Los Angeles,* 67 Cal.2d 350, 62 Cal.Rptr. 193, 431 P.2d 849 (1967). In the context of the cable television case at bar it is especially helpful to bear in mind several venerable principles stated by the California Supreme Court: "it is not essential to a dedication that the legal title pass from the owner; ... nor is it essential that there should be any grantee of the use or easement *in esse* to take the fee ..."; and " '[i]t is not essential that this right of use should be vested in a corporate body; it may exist in the public, and have no other limitation than the wants of the community at large.' " *Carpenteria School Dist. v. Heath,* 56 Cal. 478, 480 (1880) (quoting *Mayor of New Orleans v. United States,* 35 U.S. (10 Pet.) 662, 713, 9 L.Ed. 573 (1836). Thus, as the *White* Court stated:
In this [public dedication] class of cases, there may be instances, contrary to the general rule [in private cases], where the fee may remain in abeyance, until there is a grantee capable of taking; where the object and purpose of the appropriation look to a future grantee, in whom the fee is to vest.
31 U.S. (6 Pet.) at 436; *see also* note 8 *supra;* note 14 *infra.*

**10.** Under a series of enactments commonly referred to as Subdivision Map Acts, California has long provided that local government entities may require various dedications as conditions of approval of the subdivision of land. This statutory scheme, which has undergone numerous amendments, is currently codified at Cal. Govt.Code §§ 66410–66499.37 (West 1983 & Supp.1988).

**11.** Ordinance 510 adopted the " 'Rules for Land Subdivision' " promulgated by the City Planning Commission on April 9, 1930. City Ordinance No. 510 (quoting commission's rules). Unfortunately, the ordinance did not attach or describe in detail the commission's rules, *id.,* and extraordinary research efforts by the Court have failed to discover a copy in publicly available records. Even if those rules and their successors did not make absolutely clear that the 1939 dedications at issue were to the City itself, however, given that the dedications are merely representative of dedications made throughout Palo Alto's history, there is no doubt that dedications of public rights of way have typically been required to be to the City.

offered for dedication for public uses, whether they be intended for public highways, parks, courts, commons, building sites, drainage, or other public uses of any kind or description whatsoever, and their dimensions and boundaries definitely shown and defined. Such dedication shall be *deemed to the city,* city and county, county, school or high school district, reclamation, irrigation, or flood control district or any and all other districts created for a special use or purpose within which such dedicated area is located and the special functions of which embrace the purpose for which the dedication is limited; *provided,* that when such map shows by express language an intention to transfer such dedicated area to another entity, said intention shall control....

Sec. 18. Such final map may particularly set forth easements and rights of way dedicated by said map to any person, association or municipality, county or corporation for itself or as trustee for others for public utility purposes. Any city, city and county, or county may act as trustee for such purposes and may transfer the whole or part of the said easement when not inconsistent with provisions and terms of said trust, without regard to the limitations placed upon ordinary transfers of interest in land by such bodies.

1929 Cal.Stat. 837, §§ 17–18 (first emphasis added).

Second, the exemplary dedications were expressly accepted by Palo Alto by an act of the City Council as certified on the same blueprint in the following language:

[The] Council did ... accept the dedication of all streets, roads, and other parcels of land upon said portion of said map therein offered for dedication, and did also accept the easements, as shown, for the use of public utilities.

Fellman Declaration, Exhibit B–1. Although this acceptance alone is not necessarily dispositive,[12] it is particularly relevant in construing the dedications here. Throughout its modern existence, Palo Alto

has asserted substantial authority over the public rights of way and the users of them. Indeed, providing means for doing so was one of the principal objects of the City's original charter. Palo Alto, Cal., Charter (1909) [hereinafter City Charter]. Thus, the City was empowered:

. . . . .

4. To purchase, receive, have, take, hold, lease, use and enjoy property of every kind and description, ... and to control and dispose of the same for the public benefit [and]

. . . . .

9. To acquire, construct, maintain and operate all necessary works for the supplying of the City and its inhabitants with water, light, heat, power, telegraphic and telephonic communication, and for the conveyance of passengers and freight over, under and upon public streets and rights of way secured therefor....

City Charter art. II. Moreover, Palo Alto specifically provided that use of the public ways was dependent upon a "grant" from the City:

No person, firm or corporation shall ever exercise any franchise, license, permit, easement, privilege or other use, except in so far as he or it may be entitled to do so by direct authority of the constitution of the State of California, or of the constitution or laws of the United States, in, upon, over, under or along any street, highway or other public place in the City unless he or it shall have first obtained a grant therefor in accordance with the provisions of this charter.

*Id.* art. IX, § 8.

Further, the City has always been vigorous in its exercise of such authority with respect to users of the rights of way. *See, e.g.,* City Ordinance No.s 48 (May 8, 1911) (setting price and otherwise regulating provision of electricity), 44 (Apr. 10, 1911) (setting price of natural gas). Indeed, Palo Alto currently provides electricity, gas, wa-

---

**12.** *See* note 14 *infra.*

ter, and sewer services through its own municipal utilities. *See, e.g.,* Defendants' Declaration of William Zaner of October 2, 1987, at 5 [hereinafter Zaner Declaration II]. Perhaps more tellingly, Palo Alto regulated telephone rates and service, *see, e.g.,* City Ordinance No. 29 (Sept. 12, 1910) (setting price and prescribing quality of telephone service), until such regulation was taken over by the state through the Railroad Commission and its successor the Public Utilities Commission (the "PUC"), *see, e.g.,* City Ordinance No.s 74 (Apr. 23, 1912) (providing for special election to determine whether City should retain control of telephone and other utilities), 70 (Apr. 9, 1912) (repealed) (setting price of telephone service).

With respect to cable television itself, the Cities have followed this pattern by enacting and administering a highly detailed franchising program that includes the contested franchise fee. Moreover, the State of California has clearly delegated primary power to the Cities to assert their authority over cable television and has expressly authorized the Cities to charge a "franchise fee for any franchise or license" of up to the five percent of receipts, Cal.Govt.Code § 53066, permitted by federal legislation, 47 U.S.C. § 542(b). Given that California's legislation expressly anticipates that cable will use public rights of way and that local government entities will have the power to authorize such use, *see, e.g.,* Cal.Govt.Code 53066,[13] it appears that the legislature intended that the Cities have the right to hold in trust the public's property interests in the rights of way for cable television.[14]

---

**13.** Section 53066 expressly provides in part that: Any cable television franchise or license awarded by a city or county or city and county pursuant to this section may authorize the grantee thereof to place wires, conduits and appurtenances for the community antenna television system along or across such public streets, highways, alleys, public properties, or public easements of said city or county or city and county. Public easements, as used in this section, shall include but shall not be limited to any easement created by dedication to the city or county or city and county for public utility purposes or any other purpose whatsoever.

**14.** It might also be argued that California law has distinguished between acceptances by a local government entity of dedications of property rights *to the public* and acceptances of the ownership of such dedicated property rights *by the government entity,* and that here the Cities have no property interests because only the former acceptances have occurred. *See generally, e.g., Benitez v. City and County of San Francisco,* 77 Cal.App.3d 918, 920–22, 144 Cal.Rptr. 15 (1978). The best expression of this distinction appears to be in an opinion of the state attorney general, which, in the course of examining the dedication of rights of way for roads under the Subdivision Map Act, found that:

A "dedication" is the application of private real property to a public use. A dedication may be accomplished by statutory means (generally, complying with the provisions of the [Subdivision Map] Act) or by nonstatutory, common-law methods. Both an offer and an acceptance are required to effectuate a dedication; the offer may be accepted by a formal resolution of the governing body that has jurisdiction over the property or by informal public use or other governmental action. The significance of accepting an offer of dedication is that the property is thereafter held in trust for public use; the property is no longer subject to private control. It does not follow, however, that property open to public use must be maintained by the governing body that accepted the offer of dedication.

Although a road is a "public street" and subject to "public control," it need not necessarily be maintained by the local governing entity. All roads over which the public has a right to travel, whether express or prescriptive, are "public" roads. "Public" roads, however, are not "county" roads until accepted as such by appropriate resolution of the board of supervisors. The general rule is that a county may not use county road funds for maintaining "public" roads other than "county" roads....

[A] two-step procedure is required for imposing upon a county the responsibility of maintaining roads dedicated to public use. First, the offer of dedication is accepted, making them "public roads"; second, ... the appropriate resolution is passed, accepting the roads into the county highway system and thus the responsibility for their maintenance. 61 Op.Cal.Att'y Gen. 466, 468–69 (1978) (citations omitted). Thus, "the significance of accepting an offer of dedication, whether under the [Subdivision Map] Act or otherwise, is that the property becomes subject to public use" only. *Id.* at 469. Not until the additional acceptance of the property interest itself does the public entity acquire "*'ownership'* or responsibility for maintenance" of rights of way. *Id.* (emphasis added). Although no authority appears to have contemplated the property rights situation presented to the Court, it does not seem unlikely that the California Supreme Court would follow the above analysis with re-

In sum, there is every indication that defendants do have property interests in the public rights of way for cable that plaintiff seeks to use, and that the reasoning of *County of Sacramento v. Pacific Gas & Elec. Co.*, 193 Cal.App.3d 300, 238 Cal.Rptr. 305 (1987), does not compel a contrary conclusion in this case.[15] Accordingly, the Court must next consider plaintiff's arguments that the Constitution nevertheless bars the Cities from charging the franchise fee.

### B. *First Amendment Analysis of the Franchise Fee*

Century Federal raises two essential arguments as to why the franchise fee is unconstitutional. First, plaintiff argues that, even if the Cities do have property interests in the areas where plaintiff's cable passes, the franchise fee cannot be justified either as a reasonable time, place, and manner restriction on protected speech or as a restriction on a non-speech element of conduct involving protected expression. Second, Century Federal asserts that, given that the Cities charge other users of the rights of way such as Pacific Bell less than the franchise fee or nothing at all, imposing the fee on plaintiff constitutes a levy discriminating against the press in violation of the first amendment under cases such as *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

At the outset, it must be recognized that the courts have used different and perhaps inconsistent approaches to analyze first amendment issues similar to those presented in this case. It is therefore not clear whether one or more of the existing standards are appropriate here, or indeed even whether the existing analyses are adequate. As first amendment jurisprudence and new technologies have evolved, Justice Jackson's forthright remark has proven all too prophetic:

> The moving picture screen, the radio, the newspaper, the handbill, the sound truck and the street corner orator have differing natures, values, abuses and dangers. Each, in my view, is a law unto itself, and all we are dealing with now is the sound truck.

*Kovacs v. Cooper*, 336 U.S. 77, 97, 69 S.Ct. 448, 459, 93 L.Ed. 513 (1949) (Jackson, J., concurring); *see generally, e.g.*, L. Tribe, *American Constitutional Law* 794–841, 977–1010 (2d ed. 1988); Stone, *Content–Neutral Restrictions*, 54 U.Chi.L.Rev. 46 (1987); Stone, *Restrictions of Speech Because of its Content: The Peculiar Case of Subject–Matter Restrictions*, 46 U.Chi. L.Rev. 81 (1978); note 30 *infra*. Accordingly, the Court will examine and apply the most likely approaches below.

#### 1. Time, Place, and Manner Analysis, O'Brien Analysis, and Forum Analysis

Although government is generally prohibited from regulating speech on the basis of content, it may properly regulate the

---

spect to the dedication of rights of way for cable television.

To address this argument it is accordingly necessary to determine whether the Cities have accepted not only the dedications of rights of way to the public but also the property interests in the cable property rights conveyed by the dedications as well. Defendants have offered no evidence of express acceptances of those interests, and it might be argued that the Cities therefore have not accepted any property interests in the rights of way. However, there appears to be ample indication that the Cities have impliedly accepted the property rights in the dedicated rights of way for cable operations. The Cities' assertion of authority through their cable franchising scheme discussed above would appear to be more than adequate to constitute the second step of acceptance of the

dedications of the cable rights of way, and under this analysis the Cities again appear to have property interests in the disputed rights of way.

**15.** Whatever the accuracy of *Sacramento*'s sweeping statements regarding the law of easements, a close reading reveals the case to be of little aid to plaintiff. For example, *Sacramento* categorically states that "[p]ublic utility easements ... are *not* granted in the public streets and highways," 193 Cal.App.3d at 313, 238 Cal. Rptr. 305 (emphasis added), an assertion diametrically opposed to Century Federal's crucial contention that it will avoid using the Cities' property by using precisely such dedicated public utility easements in the streets, *see, e.g.*, Tr. at 40. Thus, even accepting plaintiff's argument that *Sacramento* is controlling, plaintiff's cable would necessarily occupy municipal property.

time, place, and manner in which speech is made. As the Supreme Court summarized the well-settled three-part time, place, and manner analysis in *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (citations omitted):

> Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided [1] that they are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information.

A related analysis is used to determine the constitutionality of regulations of conduct that involves both speech and nonspeech elements. In the leading case of *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), the Supreme Court set forth this four-step analysis as follows:

> [A] government regulation is sufficiently justified [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.[16]

**16.** As the court in *Group W I* noted, the Supreme Court has "suggested that the government need not apply the least restrictive regulation imaginable to pass the fourth prong of the *O'Brien* test." *Group W I*, 669 F.Supp. at 974 n. 31. Thus, in *United States v. Albertini*, 472 U.S. 675, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985), Justice O'Connor, writing for the majority in a case concerning the barring of a protestor from a military base, stated that:

> [A]n incidental burden on speech is no greater than is essential, and therefore is permissible under *O'Brien*, so long as the neutral regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. Cf. [*Clark*] 468 U.S., at 297 [104 S.Ct. at 3071] ("if the parks would be more exposed to harm without the sleeping prohibition than with it, the ban is safe from invalidation under the First Amendment").

*Id.* at 689, 105 S.Ct. at 2907; *see* text following note 17 *infra*. Lower courts remain in a state of considerable confusion as to how to interpret this statement. By way of illustration, as the Fifth Circuit recently observed in the course of an opinion mixing post-*Albertini* four-part *O'Brien* analysis with three-part time, place, and manner analysis:

> At the outset, we note that although the Supreme Court has required "narrow tailoring" even within the area of content-neutral regulations, it is not clear what level of exactitude is appropriate.

*SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1275 (5th Cir.1988) (footnoting *O'Brien*'s part-four requirement that restriction must be no greater than essential, 391 U.S. at 377, 88 S.Ct. at 1679; other citations and footnote omitted) [hereinafter *SDJ I*], *further opinion on denial of rehearing and rehearing en banc*, 841 F.2d 107 (5th Cir.1988) [hereinafter *SDJ II*], *petition for cert. filed sub nom. M.E.F. Enterprises, Inc. v. City of*

*Houston*, 57 U.S.L.W. 3001 (U.S. June 10, 1988) (No. 87–2052). *Compare also, e.g., Rock Against Racism v. Ward*, 848 F.2d 367, 370 (2d Cir. 1988), *cert. granted*, — U.S. —, 109 S.Ct. 53, 102 L.Ed.2d 31; *Rosenfeld v. Ketter*, 820 F.2d 38, 41 (2d Cir.1987); *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1059 n. 3 (9th Cir.1986); *In re G. & A. Books, Inc.*, 770 F.2d 288, 297–98 (2d Cir.1985), *cert. denied sub nom. M.J.M. Exhibitors, Inc. v. Stern*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986).

Read simplistically, *Albertini* might seem to suggest that a burden is permissible so long as the government interest is achieved more effectively with the regulation than without it, in other words, so long as the regulation furthers the interest. *See, e.g., SDJ I*, 837 F.2d at 1276 ("Under this standard, in other words, an ordinance is sufficiently well tailored if it effectively promotes the government's stated interest." (footnote omitted)). Such an interpretation, however, would of course seemingly render *O'Brien*'s part four completely redundant, because part two already includes the simple determination whether a regulation furthers a government interest. Accordingly, this interpretation of *Albertini* appears to be improper, for the Supreme Court can hardly be presumed to have intended such an outcome.

Instead, *Albertini*'s formulation of step four should probably be understood in the context of its facts as standing for no more than the commonsense proposition that the courts need not conjure up every "imaginable" or "conceivable" least restrictive way in which the government might achieve its interest. *See Albertini*, 472 U.S. at 688–89, 105 S.Ct. at 2906–07; *Group W I*, 669 F.Supp. at 974 n. 31; *cf. Project 80's, Inc. v. City of Pocatello*, 857 F.2d 592, 599–600 (9th Cir.1988) ("Even if we assume that the 'least restrictive alternative' requirement [of part four of the commercial speech standard of *Central*

It is important to note that step two of this analysis calls for a balancing of interests, in which "the critical inquir[y is] whether [the governmental] interest is sufficiently substantial to justify the effect of the ordinance on [the restricted] expression." *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984); *see also, e.g., Century Federal II,* 648 F.Supp. at 1476 n. 18. Applying this analysis in *O'Brien,* the Court found that Congress could constitutionally prohibit the nonspeech conduct involved in burning a draft card in a protest against the draft and the war in Vietnam because the government had a "legitimate and substantial interest" in preventing disruption of the smooth functioning of the selective service system. *O'Brien,* 391 U.S. at 380, 88 S.Ct. at 1680.

It is sometimes far from clear when one or the other of these tests is appropriate, however, and the Supreme Court has stated that the tests are similar if not indistinguishable.[17] *Clark,* 468 U.S. at 298 & n. 8, 104 S.Ct. at 3071 & n. 8. Indeed, rather than harmonizing the tests or making clear in what circumstances one or the other is appropriate, the Supreme Court itself has sometimes avoided distinguishing between the tests simply by relying on either or both. Thus, in the *Clark* case, the Court used both these analyses in finding that the National Park Service could properly prohibit protesters against homelessness from camping on the Capitol Mall. *Clark,* 468 U.S. at 293–99, 104 S.Ct. at 3069–72; *see also, e.g., id.* at 298 n. 8, 104 S.Ct. at 3071 n. 8 (noting that *Vincent* "framed the issue under *O'Brien* and then based a crucial

*Hudson Gas & Elec. Corp. v. Public Service Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed. 2d 341 (1980),] need not, in all good sense, be employed to the full extent of the superlative 'least,' the ordinances of [the defendant municipalities] fall far short of any reasonable requirement of necessity."). Thus, to take Justice O'Connor's example, a court ought not dream up and then require an "absolute" least restrictive regulation, so that for instance the military would have to go to the absurd length of assigning a detail of military police to chaperone an anti-nuclear protestor to ensure that he does not again demonstrate against the military while visiting an Air Force base open house; in *Albertini* the simple barring of the protestor from the base entirely was no more restrictive than essential given the military's uniquely important interest in security.

Accordingly, rather than signaling a remarkable evisceration of or departure from *O'Brien's* step four, *Albertini* should probably be read as though it were intended to be consistent with: a long line of precedents [holding that a] regulation can survive only if the governmental interest outweighs the burden and cannot be achieved by means that do not infringe First Amendment rights as significantly. *Minneapolis Star,* 460 U.S. at 586 n. 8, 103 S.Ct. at 1373 n. 8 (citing *O'Brien,* 391 U.S. at 376–77, 88 S.Ct. at 1678; other citations omitted); *see also, e.g., Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 706–07 & n. 3, 106 S.Ct. 3172, 3177–78 & n. 3, 92 L.Ed.2d 568 (1986) ("'least restrictive means' scrutiny" is appropriate where restriction is on "conduct with a significant expressive element that drew the legal remedy in the first place, as in *O'Brien,* or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive ac-

tivity, as in *Minneapolis Star*" (footnote omitted)); *City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 2129, 80 L.Ed.2d 772 (1984) (under *O'Brien* step four, "the critical inquir[y is] whether ... the effect of the ordinance on [the restricted] expression ... is no greater than necessary to accomplish the City's purpose"). This interpretation of *Albertini* may be lent further credence by the fact that a majority of the Supreme Court not long ago rejected a dissent on this issue by the authors of the opinions giving rise to *Albertini's* so-called "clarification" of *O'Brien* step four, *SDJ I,* 837 F.2d at 1276 n. 25, in a summary affirmance, *City of Watseka v. Illinois Public Action Council,* 479 U.S. 1048, 107 S.Ct. 919, 920, 93 L.Ed.2d 972 (1987) (White, J. (author of *Clark*), dissenting; O'Connor, J. (author of *Albertini*), joining in dissent of White, J.), of a Seventh Circuit case, *City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547, 1551–54 (7th Cir. 1986), that used typical less-restrictive-means analysis. *Cf. Project 80's,* 857 F.2d at 599. *But see SDJ II,* 841 F.2d at 108–09.

**17.** Of course, under both these tests, the government has the burden of justifying restrictions on protected activity. *See, e.g.; Minneapolis Star,* 460 U.S. at 583, 103 S.Ct. at 1370 ("[W]e ordinarily ... requir[e] the government to justify any burdens on First Amendment rights by showing that they are necessary to achieve a legitimate overriding governmental interest." (citation omitted)); *ECCAG,* 723 F.2d at 1055–57 (government has burden under three-part time, place, and manner test); *Preferred Communications I,* 754 F.2d at 1406 n. 9 (government has burden under four-part *O'Brien* test); *Group W I,* 669 F.Supp. at 962 (same); *Century Federal II,* 648 F.Supp. at 1475 (same).

part of its analysis on the time, place, and manner cases").

Another fundamental approach in first amendment analysis is the familiar distinction between the various kinds of fora in which speech occurs. In the leading case of *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), the Supreme Court attempted to rationalize first amendment analysis in terms of three categories of such fora. In the first category, the "traditional public forum" such as a street or park, the *Perry* Court found that:

> [T]he rights of the State to limit expressive activity are sharply circumscribed.... For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

*Id.* at 45, 103 S.Ct. at 955 (citations omitted).

These same standards apply to the second category of forum, *e.g.*, *Perry*, 460 U.S. at 46, 103 S.Ct. at 955; *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 570–71 (9th Cir.1984), *cert. denied*, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985), the "designated" or "limited public forum," such as a school facility or municipal theatre that has been opened for use by the public for expressive activity, *Perry*, 460 U.S. at 45–46, 103 S.Ct. at 955.

Different standards apply, however, in the third category of forum, the "nonpublic forum," defined as "[p]ublic property which is not by tradition or designation a forum for public communication," such as a school's restricted internal mail system. *Id.* at 46–48, 103 S.Ct. at 955–56. In this third category of forum,

> [i]n addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is [1] reasonable and [2] not an effort to suppress expression merely because public officials oppose the speaker's view.

*Id.* at 46, 103 S.Ct. at 955 (citation omitted).

In a leading case attempting to apply such first amendment principles to the question of when the government may charge for speech-related activity, *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767, 770 (2d Cir.1984), the Second Circuit relied on cases such as *Clark* in finding constitutional a government corporation's "revenue raising licensing fees" for the placement of newspaper racks in commuter train stations. In doing so, *Gannett* first analyzed what type of forum the newsrack area of the commuter train stations was. The court followed the analysis of *Perry*, and found that this public area should be analyzed as a category-three *non* public forum.[18] *Gannett*, 745

---

**18.** The court so found even though it determined that this area of the train stations was public, that it should be viewed as a forum appropriate for newspaper racks, 745 F.2d at 773, that newsracks had long been permitted, *id.* at 770, and that they had in fact been installed and used to distribute papers for many years, *id.* at 773. In *Calash v. City of Bridgeport*, 788 F.2d 80 (2d Cir.1986), the Second Circuit reached a similarly questionable result in finding that a municipal stadium was a category-three nonpublic forum even though expressive activity had frequently been officially allowed there. The *Calash* court did so despite its description of the stadium as "a large, outdoor arena, located on *park* land adjacent to a public high school," and its finding that the municipality allowed "civic, charitable and non-profit organizations" to use the stadium for expressive, fundraising purposes such as a Beach Boys concert. *Id.* at 81 (emphasis added). On that basis, the court found that the municipality's denial of the stadium to a private promoter for Beach Boys and other concerts to be constitutional. *Id.* at 81, 83–85.

This approach to forum analysis would seem to be in considerable tension with cases such as *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 563, 95 S.Ct. 1239, 1244–45, 1249, 43 L.Ed.2d 448 (1975), where the Supreme Court treated a municipal theatre as a category-two designated public forum, *see Perry*, 460 U.S. at 45–46, 103 S.Ct. at 955, and *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 570 (1984),

F.2d at 772–73. The Second Circuit then went on to determine whether the license fee was justifiable as a reasonable time, place, and manner restriction, using the three-part time, place, and manner analysis [19] to find that:

> [L]icensing fees are permissible *manner* restrictions because they are [1] content-neutral, [3] leave open alternative means to distribute newspapers and [2] are the least restrictive means of serving [the government corporation's] interest in raising revenue for the efficient, self-sufficient operation of the commuter lines.

*Gannett*, 745 F.2d at 773 (emphasis added). The court thought it highly significant that the government corporation was acting in a "proprietary" rather than a "traditional governmental" capacity,[20] and explicitly used a balancing test in determining that the government's interest in raising revenue outweighed the burden on the newspaper's interest in speaking.[21] *Gannett*, 745 F.2d at 774–75.

Judge Schwarzer of this district recently relied in large measure on *Gannett* in the cable television case of *Group W Cable, Inc. v. City of Santa Cruz*, 669 F.Supp. 954 (N.D.Cal.1987) [hereinafter *Group W I*], *further proceeding*, 679 F.Supp. 977 (N.D.Cal.1988) [hereinafter *Group W II*]. Having found that the City of Santa Cruz owned the rights of way through which the cable of an existing television system ran, *e.g., Group W II*, 679 F.Supp. at 979, the court found that the municipality's five percent franchise fee was constitutional using the four-part *O'Brien* analysis rather than the three-part time, place, and manner test,[22] *Group W I*, 669 F.Supp. at 972–75; *Group W II*, 679 F.Supp. at 979–80.

At the outset, the court determined that even though the utility poles and structures and public easements and rights of way constitute a category-two limited pub-

---

cert. *denied*, 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985), where the Ninth Circuit expressly held that an outdoor amphitheatre was a category-two public forum, and *Rock Against Racism*, 848 F.2d at 369, where the Second Circuit itself recently found a bandshell in a park to be a category-one traditional public forum. Indeed, a municipal facility for civic, artistic, sporting, political, and other events attracting large numbers of people would seem to be the quintessential designated public forum. *See, e.g., Perry*, 460 U.S. at 45–46, 103 S.Ct. at 955. The Second Circuit's determination that the forum in *Gannett* and in *Calash* was a nonpublic forum rather than a public one may be the result of attempting to fit a difficult case into an incomplete analytical framework.

A better approach would seem to be forthrightly to recognize such a forum as a category-two limited public one and then to determine whether the discriminatory restriction at issue comports with the legitimate purposes for which the forum is designated. *See, e.g., Cinevision*, 745 F.2d at 571–77. As the Second Circuit itself seemed to acknowledge, using this approach, *Calash* might have reached the same result by finding that the profit-seeking promoter was properly excluded because although the stadium was clearly a designated public forum it was limited to use by civic, charitable, and nonprofit organizations. *See Calash*, 788 F.2d at 84.

**19.** The *Gannett* court did not explain why it chose to analyze the licensing fee under the three-part time, place, and manner test instead of the four-part *O'Brien* test. *Gannett*, 745 F.2d at 773.

**20.** Thus, *Gannett* seemed to justify its result by noting that the government was acting via a special "'self-sustaining'" government corporation; that the corporation's limited purpose was the commercial, nontraditional one of running a formerly private railroad; and that the receipts from the rental fee were destined not for general government revenue but solely for the operation of the railway. *Gannett*, 745 F.2d at 774–75; *see* note 33 *infra*.

**21.** Although prior to the litigation the fee was not closely related to the amount of floor space occupied by newsracks, *see Gannett*, 745 F.2d at 770–71, and though the court found that the government corporation had attempted to charge comparable speakers unequal license fees, *id.*, the Second Circuit nevertheless believed that it was henceforth proper to analogize the license fee to a rent for the use of property and to justify the fee on that basis, *e.g., id.* at 775. The court accordingly determined that a proper remedy was:

> to enter an order prohibiting [the government corporation] from discriminating unreasonably in fees charged for licensing of newsracks, with any fees subsequently established to be applied retroactively on a non-discriminatory basis.

*Id.* at 776.

**22.** Although relying extensively on *Gannett*, the *Group W* court did not explain why it rejected *Gannett*'s use of the three-part time, place, and manner test in favor of the four-part *O'Brien* analysis.

lic forum for cable television,[23] it might still be permissible for the municipality to impose a reasonable fee on cable television if it were viewed as a rent for use of municipal rights of way.[24] *Group W I,* 669 F.Supp. at 972–75; *Group W II,* 679 F.Supp. at 979–80. Applying *O'Brien* analysis, the court found that, first, Santa Cruz had clear statutory authority to charge the franchise fee. *Group W I,* 669 F.Supp. at 973. Under the second step, the municipality had a substantial government interest in receiving "compensation for the grant of a permanent interest in public property." *Id.* Third, the court found that the franchise fee was unrelated to the suppression of free speech because Santa Cruz also charged other users of public property.[25] *Group W I,* 669 F.Supp. at 974. Finally, under the fourth *O'Brien* step, the *Group W* court found that "the imposition of a reasonable fee creates an 'incidental restriction on . . . First Amendment freedoms [that] is no greater than is essential to the furtherance' of Santa Cruz's interest

in receiving compensation for the use of its property." *Group W I,* 669 F.Supp. at 974 (quoting *O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679) (ellipse and brackets in original). Although it had relied solely on four-step *O'Brien* analysis rather than three-step time, place, and manner analysis, the *Group W* court thereafter characterized the franchise fee as a reasonable time, place, and manner restriction.[26] *Group W II,* 679 F.Supp. at 980.[27]

■ Turning to the case at bar, the relevant forum should be analyzed as one that has been designated as public for the purpose of cable television communications. *See, e.g., Preferred Communications I,* 754 F.2d at 1408–09; *Group W I,* 669 F.Supp. at 973; *Group W II,* 679 F.Supp. at 980; note 23 *supra.* As the Ninth Circuit observed in *Preferred Communications I,* 754 F.2d at 1409, California's legislation strongly indicates that the cable forum should be treated as a designated public one. For example, the state has specifical-

**23.** *Group W* found that *Preferred Communications I* had *held* that cable television occupies a limited public forum and that this ruling continues to be the law of the Ninth Circuit even after the Supreme Court affirmed *Preferred Communications I* on narrower grounds in *Preferred Communications II. See Group W I,* 669 F.Supp. at 973; *Group W II,* 679 F.Supp. at 980. While it is not certain whether the Ninth Circuit intended its discussion of cable as occupying a designated public forum to be dispositive, *see Preferred Communications I,* 754 F.2d at 1409; *see generally Group W I,* 669 F.Supp. at 961 n. 12; *Century Federal II,* 648 F.Supp. at 1468 n. 6, this Court agrees that the thrust of the *Preferred Communications I* opinion indicates that the typical cable forum is a designated public one. *See* notes 28–29 and accompanying text *infra.*

**24.** Although *Group W* relied principally on *Gannett* for this proposition, given the Second Circuit's heavy reliance on its finding that the portion of the commuter railway in *Gannett* should be analyzed as a category-three *non* public forum, it is not self-evident that *Gannett* is authority for imposing a franchise fee on cable television in a category-two *public* forum such as the one in *Group W.*

**25.** The court reached this conclusion while at the same time specifically finding that the municipality charged some of these other users less than half as much for apparently comparable property. *See Group W I,* 669 F.Supp. at 974 & n. 29; note 39 *infra.*

**26.** Going on to consider what fee would be reasonable, the court stated that while the municipality had a substantial interest in receiving the "fair market value" for its property,

> [a] charge in excess of fair market value would, however, not be sufficiently tailored to Santa Cruz's proprietary interest in its property and thus would unreasonably burden Group W's ability to exercise its First Amendment freedoms. Although an excessive fee would further Santa Cruz's interest in raising revenue, this interest could be achieved as effectively by a general tax on all businesses.

*Group W I,* 669 F.Supp. at 974 (citing *Minneapolis Star,* 460 U.S. at 586, 103 S.Ct. at 1372).

**27.** For a different and unconvincing approach to first amendment analysis of cable television in general and franchise fees in particular, proceeding from the premise that cable television should be subject to a pervasive extent of regulation similar to that permissible for broadcast media under *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), *see Erie Telecommunications, Inc. v. City of Erie,* 659 F.Supp. 580 (W.D.Pa.1987), *aff'd on other grounds,* 853 F.2d 1084 (3d Cir.1988) (finding it unnecessary to reach first amendment issues because plaintiff cable operator had waived its constitutional and other claims via an express release in settlement of prior litigation).

ly deemed excess space on utility poles and other structures to have been dedicated by public utilities for use by cable operators, and formally declared that such provision for cable television is in the public interest. Cal.Pub.Util.Code § 767.5(b).[28] Similarly the state has expressly empowered local government entities to authorize cable operators' use of a sweeping range of public rights of way. Cal.Govt.Code § 53066; see note 13 supra. Likewise, through their

franchising program, the Cities have made strenuous efforts to foster cable television in the relevant forum. It is therefore apparent that Century Federal is entitled to more than the minimal protection of speech in a nonpublic forum.[29] See Perry, 460 U.S. at 45–46, 103 S.Ct. at 955.

■ Assuming that the three-part time, place, and manner analysis is appropriate,[30] it does not appear that the fran-

---

**28.** Thus, Section 767.5 provides in pertinent part that:

> (b) The Legislature finds and declares that public utilities have dedicated a portion of [utility] support structures to cable television corporations for pole attachments in that public utilities have made available, through a course of conduct covering many years, surplus space and excess capacity on and in their support structures for use by cable television corporations for pole attachments, and that the provision by such public utilities of surplus space and excess capacity for such pole attachments is a public utility service delivered by public utilities to cable television corporations.
>
> The Legislature further finds and declares that it is in the interests of the people of California for public utilities to continue to make available such surplus space and excess capacity for use by cable television corporations.

(West Supp.1988) (emphasis added). However, there is no merit to plaintiff's argument that this section by itself entitles Century Federal to use the contested rights of way. See, e.g., Group W I, 669 F.Supp. at 962–63.

**29.** In light of the Court's findings below that the Cities' franchise fee is unconstitutionally discriminatory, it is apparent that the fee does not survive even the minimal first amendment scrutiny that would be appropriate if the rights of way were a nonpublic forum for cable purposes. See Perry, 460 U.S. at 46, 103 S.Ct. at 955; Preferred Communications I, 754 F.2d at 1409; text following note 17 supra.

**30.** Courts have not thoroughly addressed the constitutionality of revenue-raising fees on activities implicating the first amendment, especially outside the traditional public forum, and as noted above it is not clear what analyses may be appropriate to assess the propriety of such fees. Although it seems beyond question that revenue-raising fees on protected activities in a traditional public forum are impermissible even though the government may indeed have a property interest in the forum, at least when such activities are the traditional ones for which the forum has existed, e.g., compare, Murdock v. Pennsylvania, 319 U.S. 105, 110–17, 63 S.Ct. 870, 873–77, 87 L.Ed. 1292 (1943) (majority opinion)

with id. at 140, 63 S.Ct. at 901–02 (Frankfurter, J., dissenting) (majority erred because government could constitutionally tax door to door solicitors for their use of the streets); cf., e.g., Grayned v. City of Rockford, 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222 (1972) (" 'Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " (quoting Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)) (citations omitted)); but cf., City of Lakewood v. Plain Dealer Publishing Co., — U.S. —, 108 S.Ct. 2138, 2147 n. 7, 100 L.Ed.2d 771 (1988) (declining to reach question whether municipality could "constitutionally prohibit the placement of newsracks on public property"), it would seem improbable that the Constitution necessarily bars such charges in a category-two public forum designated for purposes including revenue.

Thus, in a facility such as an auditorium provided by a municipality for public performances and designated as a category-two forum, see, e.g., Cinevision, 745 F.2d at 569–77, it may seem unobjectionable for a municipality purposefully to raise some revenue as well as cover its administrative or operating costs by charging rent for allowing protected speech such as a theatre production, but cf., e.g., Southeastern Productions, 420 U.S. at 549 n. 4, 95 S.Ct. at 1242 n. 4 (" '[The municipal auditorium] will not be operated for profit, and no effort to obtain financial returns above the actual operating expenses will be permitted. Instead its purpose will be devoted for cultural advancement, and for clean, healthful, entertainment which will make for the upbuilding of a better citizenship.' " (quoting Chattanooga Memorial Auditorium booklet)). Although courts have often stated that the analyses for category-one and category-two fora are identical, see, e.g., Perry, 460 U.S. at 45–46, 103 S.Ct. at 955; Cinevision, 745 F.2d at 570–71, it does not appear that identical analyses will result in the expected different outcomes, so that, for example, revenue-raising fees for temporarily occupying the streets or a reviewing stand for a protest or parade will remain unconstitutional while rental for occupying a municipal auditorium for a symphony will be permissible. It

chise fee has been justified without reference to its content, as required to satisfy step one. At the outset, it is true that on its face the franchising program's fee provision singles out a type of speaker or medium, not the content of the message that speaker or medium communicates. However, it is not always self-evident whether speech restrictions are more properly analyzed as content based or content neutral. *See, e.g., City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–50, 106 S.Ct. 925, 929–30, 89 L.Ed.2d 29 (1986). Here, defendants' franchising program does not purport to provide for equal charges on all users of the Cities' public rights of way;[31] on the contrary, the program is aimed exclusively at cable television operators engaging in speech protected by the first amendment. Moreover, it is uncontested that identical rights of way are occupied by other comparable users, including Pacific Bell,[32] which defendants concede they do not charge at all for its use.[33] *See, e.g.,* Zaner Declaration I at 4 ("[In defendant municipality Palo Alto, c]able operators are the only non-municipal

entities, other than the telephone company, which seek to use the City's rights-of-way and easements for the permanent installation of substantial physical plant. In addition they are the only non-municipal users of the public rights-of-way and easements, other than the telephone company, whose use imposes the very substantial burdens and disruptions that are detailed in previous declarations which the City has filed."); Zaner Declaration II at 5–6; Tr. at 34, 36; Defendants' Supplemental Memorandum at 6–8.

Although the Cities argue that they cannot charge the telephone company a fee because Pacific Bell has been granted the right to use public rights of way in the streets and highways pursuant to a state statute,[34] this does not demonstrate that users of identical public rights of way are being charged permissibly under the first amendment. Further, while the Cities attempt to justify their franchise fee by arguing that it is just like the franchise fee that defendant Atherton charges Pacific Gas and Electric Company ("PG & E") for

therefore may be necessary for category-one and category-two analyses to diverge or for free speech doctrine to evolve a different approach for analysis of revenue issues. Fortunately, given the posture of this case, the Court need not attempt to resolve the difficult analytical problems noted above.

31. Indeed, defendants' franchise program does not even link the franchise fee to the use of the Cities' property. *See, e.g.,* notes 2–4 and accompanying text *supra.*

32. Whether or in what manner the speech carried on Pacific Bell's lines may be entitled to first amendment protection does not appear to be particularly relevant in this context. The first amendment prohibits government discrimination among as well as against first amendment speakers. *E.g., Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 1726–28, 95 L.Ed.2d 209 (1987).

33. This case is thus easily distinguishable from ones such as *Gannett.* In *Gannett,* there were no comparable users of the train station property for which the government corporation was seeking rent for newspaper vending machines, 745 F.2d at 773–74, and it was apparently possible for the court to ensure that in the future rental charges on the newspapers would be non-discriminatory, *id.* at 776.

Likewise, applying *Gannett*'s differentiation between traditional governmental functions and proprietary ones, the case at bar is also easily distinguishable. Here, the Cities are acting through their ordinary organs, not a special corporation; they are carrying out a traditional governmental function by regulating use of the public rights of way, not running a formerly private railroad; and the franchise fee is going to general revenues, not the activity generating them. *See* note 20 *supra.* In any event, it is problematic whether *Gannett*'s distinction between traditional governmental and proprietary functions will prove useful as a means of first amendment analysis, particularly given that government is increasingly involved in what was formerly the private sector. *See generally* note 30 *supra.*

34. Section 7901 of the California Public Utilities Code provides as follows:
   Construction of lines. Telegraph or telephone corporations may construct lines of telegraph or telephone lines along and upon any public road or highway, along or across any of the waters or lands within this State, and may erect poles, posts, piers, or abutments for supporting the insulators, wires, and other necessary fixtures of their lines, in such manner and at such points as not to incommode the public use of the road or highway or interrupt the navigation of the waters.

its use of the public rights of way,[35] the Cities acknowledge that the charge on PG & E is *two* percent of its gross revenues, not the *five* percent their franchise fee imposes on cable operators.[36] *See, e.g.,* Tr. at 34.

At the very least these circumstances raise serious doubts that the franchise fee is content neutral. *See, e.g., Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 585, 103 S.Ct. 1365, 1372, 75 L.Ed.2d 295 (1983) ("differential treatment, . . . of the press, suggests that the goal of the regulation is not unrelated to suppression of expression"); notes 40–43 and accompanying text *infra; cf., e.g., Madison Joint School Dist. v. Wisconsin Employment Relations Comm.,* 429 U.S. 167, 175–76, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976) (treating as content based the restriction of speakers by their employment status); *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 96, 98–102, 92 S.Ct. 2286, 2290, 2291–94, 33 L.Ed.2d 212 (1972) (once forum is opened for speech, discrimination "may not be based on content alone, and may not be justified by reference to content alone"; unequal treatment of additional speakers can only be justified by showing they are clearly more disruptive than those already permitted). Indeed, the Cities' imposition of a differential rent on cable operators raises concerns strikingly similar to those discussed by the Supreme Court with respect to a differential tax on the press:

---

**35.** Defendant Palo Alto submits that it does not levy a fee on PG & E because the City distributes electricity and gas through its own municipal utilities. *E.g.,* Zaner Declaration II at 5. The Court notes that a forceful argument might be made to the effect that a government entity's charge on others for the use of its property is not rendered impermissibly discriminatory simply because the government entity does not charge itself for the use of its own property. However, such an argument is readily distinguishable from a case where a government entity levies different charges on comparable non-government users of government property. *See* note 36 *infra.*

**36.** . Despite repeated briefing of these motions, the Cities have not advanced any reasoning or evidence demonstrating that discrimination in favor of Pacific Bell and PG & E is justified under the first amendment. While the Court is thus not faced with and does not decide whether such discrimination could ever be justified, the considerable record in this case indicates that such discrimination has not been justified here, because plaintiff appears to stand in substantially the same posture vis-a-vis government as the non-municipal utilities. At least as contemplated by Congress and the California legislature, cable operators are intended to be subject to pervasive regulation by government that is remarkably similar to the regulation of the relevant public utilities, with government control over which cable operators may operate in particular localities, what service they must provide, whom they must serve, what rates they may charge, etc. Cable legislation also makes clear that the provision of cable television is in the public interest in much the same way as traditional public utilities. Moreover, although cable television may not have been formally declared to be a public utility for all purposes in California, it is subject to substantial regulation by the very same state agency that regulates Pacific Bell and PG & E. *See, e.g.,* Cal.Pub.Util. Code §§ 767.5(c) (providing that PUC may determine charges on cable operators for use of utility poles and other structures where operators and utilities unable to negotiate charges), 768.5 (providing PUC with broad powers to regulate cable operators to ensure health and safety). Finally, it should be noted that even if the Court were to countenance, as it does not, defendants' very belated efforts, via unsolicited letters to the Court long after the record on the present motions was complete, to rely on *Shell Oil Co. v. City of Santa Monica,* 830 F.2d 1052 (9th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 2901, 2902, 101 L.Ed.2d 934 (1988), a case involving commerce clause and equal protection challenges, defendants would still not have come close to carrying their burden or demonstrating the existence of a question of material fact. *See, e.g., Preferred Communications II,* 476 U.S. at 495–96, 106 S.Ct. at 2038; notes 3–4 and accompanying text *supra.*

Nor have the Cities attempted to show that the franchise fee is any less a discrimination because it results from the interaction of regulation by more than one entity of California government. Regardless of how the state legislature may divide responsibility for regulation of users of rights of way in the Cities, the fact remains that defendants' franchise fee requires plaintiff to pay five percent of its gross revenue to government when comparable users of identical property are required to pay nothing or less than half as much for use of the same property. On the record in this case, the fact that the franchise fee must be paid to government on the municipal level rather than the state level has not been shown to be relevant for first amendment purposes; the salient point here is that the discriminatory nature of the fee has not been justified. *See also* note 17 *supra.*

A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected.... When the state singles out the press, ... the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government....

Further, differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional. Differential taxation of the press, then, places such a burden on the interests protected by the First Amendment that we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance that it cannot achieve without differential taxation.

*Minneapolis Star*, 460 U.S. at 585, 103 S.Ct. at 1371–72 (citations and footnote omitted); *see also, e.g., Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 107 S.Ct. 1722, 1727, 95 L.Ed.2d 209 (1987) ("[Impermissible] discrimination can be established even where, as here, there is no evidence of an improper censorial motive. This is because selective taxation of the press—either singling out the press as a whole or targeting individual members of the press—poses a particular danger of abuse by the State." (citation omitted)). Accordingly, even though the franchise fee may perhaps be aimed at the presumably "nonexpressive activity," *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 703–04, 706–07, 106 S.Ct. 3172, 3176, 3178, 92 L.Ed.2d 568 (1986), of renting and using rights of way, if the fee is to be analyzed as a time, place,

and manner restriction, it does not appear to have been justified without reference to content.

Even if the franchise fee should be viewed as content neutral, under step two of time, place, and manner analysis the fee cannot be said to be narrowly tailored to serve a significant interest. While raising revenue is certainly a significant if not compelling interest, *see, e.g., Minneapolis Star*, 460 U.S. at 586, 103 S.Ct. at 1372, and a nondiscriminatory rent required of all users of identical public property would presumably be legitimate,[37] here the Cities have not shown that government has made any attempt to charge all comparable users an equal rent or that it has otherwise sought narrowly to tailor the fee to government's interest in revenue. Accordingly, the franchise fee does not satisfy step two.

Third, both parties contend that plaintiff's cable must pass through public rights of way, and, as defendants concede, there is accordingly no alternative forum for cable television operators to communicate. *E.g.,* Tr. at 30; *see also, e.g., Group W I*, 669 F.Supp. at 975; *Group W II*, 679 F.Supp. at 980 & n. 2.

Thus, under the classic three-step analysis for assessing time, place, and manner restrictions, defendants' franchise fee has not been justified.

■ Analysis under the four steps of *O'Brien* is similar and leads to the same conclusion.[38] Under step one, the Cities do have statutory authority to charge the franchise fee. However, under step two, although doing so would serve the substantial interest of raising revenue, it has not been shown that defendants' interest is sufficiently substantial to justify the effect on plaintiff's expression. As discussed above, given that government does not charge all users of the public rights of way the same purported rent, it does not appear that the Cities' interest is unrelated to the

---

**37.** *See* note 30 *supra.*

**38.** In a somewhat different context in this litigation, the Court has previously relied principally

suppression of speech under step three.[39] By the same token, under step four the Cities' franchise fee is unquestionably a far greater restriction on speech than is essential to serve that interest.

In short, while under some circumstances the Cities presumably could charge a nondiscriminatory rent for the use of their rights of way even though the forum is a limited public one, *see, e.g., Group W Cable I,* 669 F.Supp. at 973–74; note 30 *supra,* they may not, as here, do so in a way that impermissibly discriminates against speakers exercising protected first amendment rights. Accordingly, the Court finds that under *O'Brien* as well as time, place, and manner analysis the Cities' franchise fee has not been justified, and it is therefore unconstitutional.

### 2. Discriminatory Levy Analysis

■ In the alternative, plaintiff asserts that even assuming the franchise fee could survive analysis as a reasonable time, place, and manner restriction or as a regulation of a nonspeech element of conduct, it nevertheless is vulnerable if analyzed under the principles of *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983), some of which have been discussed above. In *Minneapolis Star,* the Supreme Court found that a state tax on newsprint and ink used in publications of a certain circulation value violated the first amendment because it was "facially discriminatory" and had "singled out the press for special treatment." *Id.* at 581, 582, 103 S.Ct. at 1370. The Court found that the government had an unusually heavy burden of justification in such a case, *e.g., id.* at 583, 103 S.Ct. at 1370–71, and that:

The appropriate method of analysis thus is to balance the burden implicit in singling out the press against the interest asserted by the State. Under a long line of precedents, the regulation can survive only if the governmental interest outweighs the burden and cannot be achieved by means that do not infringe First Amendment rights as significantly.

*Id.* at 586 n. 7, 103 S.Ct. at 1372 n. 7 (citing as examples *United States v. Lee,* 455 U.S. 252, 257–58, 259, 102 S.Ct. 1051, 1055, 1056, 71 L.Ed.2d 127 (1982); *O'Brien,* 391 U.S. at 376–77, 88 S.Ct. at 1679; *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)).

While finding that the state's asserted interest in revenue was "critical," the *Minneapolis Star* Court nevertheless found that:

Standing alone, however, it cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally, avoiding the censorial threat implicit in a tax that singles out the press.

*Id.* at 586, 103 S.Ct. at 1372 (footnote omitted). Further, the Court found "two fatal flaws" in the state's argument that the Court should analyze the tax in terms of its substance rather than its form and find that it was simply a substitute for a more generally applicable tax. *Id.* at 586–87, 103 S.Ct. at 1372–73. First, the state offered no explanation for why it had used a special "substitute" tax for the press. *Id.* at 587–88, 103 S.Ct. at 1373. Second, the Court was not persuaded that the special tax did serve as a substitute. *Id.* at 588–90, 103 S.Ct. at 1373–74. On this point, the Court rejected the state's proposal that a

---

on *O'Brien* analysis. *See, e.g., Century Federal II,* 648 F.Supp. at 1475–78 & n. 16.

**39.** As noted above, *Group W* reached a contrary conclusion with respect to this part of the *O'Brien* test, despite its similar finding that the municipality charged comparable users of public rights of way less than it charged the cable television speaker. *See* note 25 *supra.* Presumably because the parties did not argue the point, the opinion did not explain how this discrimina-

tion could be justified, and the Court believes that it has not been in the case at bar. *See* note 36 *supra.* In this regard, the Court notes that *Gannett,* on which *Group W* heavily relied, forcefully rejected discrimination generally and made no suggestion that it might be appropriate in favor of certain private users simply because they happen to be heavily regulated public utilities.

substitute tax was permissible so long as the burden it imposed on the press was less than or equal to the burden of the general tax, partly because the rule would require the courts to make constitutionally dispositive "evaluati[ons of] the relative economic burden of taxes" based on "complexities of factual economic proof." *Id.* at 589–90, 103 S.Ct. at 1374. The Court therefore concluded that:

> In sum, the possibility of error inherent in the proposed rule poses too great a threat to concerns at the heart of the First Amendment, and we cannot tolerate that possibility.

*Id.* at 590, 103 S.Ct. at 1374 (footnote omitted). The Court therefore concluded that the tax was unconstitutional both because it singled out the press and because it singled out certain members of the press.[40]

Of course, if the Cities' franchise fee in this case is viewed as the tax it appears to be on its face rather than as the rent for the use of property that defendants now assert the fee to be, *see* notes 2–4 and accompanying text *supra*, it is without question unconstitutional under *Minneapolis Star* analysis. The purpose of the fee is concededly and exclusively to generate revenue, and the Cities have alternative means of raising revenue that would not also raise first amendment concerns.[41] Defendants have not shown that cable television operators' use of the rights of way has any special characteristic that justifies the franchise fee; indeed the Cities concede that users with comparable characteristics exist and that they are charged less than Century Federal. Moreover, defendants have offered no explanation for why government has chosen a special method to tax cable, and even "speculat[ion]" does not suggest a permissible one. *Compare Minneapolis Star*, 460 U.S. at 586–87, 103 S.Ct. at 1372.

Accepting defendants' assertion that the fee is a rent makes the fit of *Minneapolis Star* somewhat less exact but does not lead to a different result, because that case was simply an application of classic first amendment principles in the taxation context. *Minneapolis Star* is highly analogous, for its prime concern was the *threat* posed by differential governmental levies on the press, *e.g.*, 460 U.S. at 588, 590, 592, 103 S.Ct. at 1373, 1374, 1375–76, and there does not appear to be any reason to believe that analysis of discriminatory charges other than taxes should differ significantly. As the *Minneapolis Star* Court made evident,

> the very selection of the press for special treatment threatens the press not only with the current *differential* treatment, by also with the possibility of subsequent differentially *more burdensome* treatment. Thus, even without actually imposing an extra burden on the press, the government might be able to achieve censorial effects, for "[t]he threat of sanctions may deter [the] exercise [of First Amendment rights] almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 433 [83 S.Ct. 328, 338, 9 L.Ed.2d 405] (1963).

460 U.S. at 588, 103 S.Ct. at 1373–74 (emphasis and brackets in original) (footnote omitted); *see also, e.g., Cloud Books*, 478 U.S. at 703–04, 706–07, 106 S.Ct. at 3176, 3177–78 (describing *Minneapolis Star* analysis as appropriate where challenged restrictions "impose a disproportionate *burden* upon those engaged in protected First Amendment activities" (emphasis added)).

As noted above, were the Cities to charge all comparable users of the public rights of way equally or to demonstrate that there is a difference between cable and other users that justifies imposing a greater rent on cable, the franchise fee would presumably be valid. However, as in *Minneapolis Star*, government here has expressly and without justification singled out the press for a special burden, in this

---

**40.** The Supreme Court has repeatedly reaffirmed its approach in *Minneapolis Star. See, e.g., Ragland,* 107 S.Ct. 1722; *Cloud Books,* 478 U.S. at 703–07, 106 S.Ct. at 3175–78.

**41.** Even if the Cities themselves did not have such means, they would not seem to be able to avoid the requirements of *Minnapolis Star* by the simple expedient of claiming that the state has authorized this and no other tax. *See* note 36 and accompanying text *supra.*

case a very weighty one. *Compare, e.g.,* 460 U.S. at 582, 585, 103 S.Ct. at 1370, 1371–72. The asserted interest of the government is revenue, and other means of achieving that interest are available that would achieve the interest as or *more* effectively, and that would do so without abridging or threatening free speech rights.[42] *Compare* 460 U.S. at 586, 103 S.Ct. at 1372. Again no explanation has been offered for why the government has chosen to enact a special regime for charging the press, and even speculation does not suggest a valid one. *Compare id.* at 587–88, 103 S.Ct. at 1373. Again the argument that the charge should be regarded as a substitute for charges levied on other entities would require this Court to perform a complex evaluation of relative economic burdens. *Compare id.* at 589–90, 103 S.Ct. at 1374.[43] Accordingly, on the record before the Court, even if the franchise fee is not characterized as an orthodox tax, the principles of *Minneapolis Star* still compel the conclusion that it is unconstitutional.

In sum, the Court finds that the Cities' franchise fee violates the first and fourteenth amendments, and that plaintiff is entitled to summary judgment on this financial requirement.

## II

### CONSTRUCTION AND PERFORMANCE BONDS

■ In light of what has been said above, resolution of the disputes regarding the other financial requirements is straightforward. With respect to the construction and performance bonds, the Court has no doubt that under their police powers the Cities may constitutionally require users of the public rights of way to post reasonable bonds sufficient to ensure that the Cities can remedy damage those users may cause in the course of using those ways. Nor does the Court doubt that the Cities can properly require bonds to ensure that physical plant installed in the public rights of way can be removed where necessary when its users cease operations. In doing so, however, the Cities must act without discrimination offensive to the first amendment.

■ Here, as discussed above, defendants have not so acted. Instead of enacting and enforcing legitimate nondiscriminatory bonding requirements that apply equally to all comparable users of the public rights of way, the Cities have singled out one class of users, cable operators entitled to first amendment protection. Defendants have not offered evidence sufficient to create a question of material fact with respect to whether their bonding requirements are the same or even roughly equivalent for all comparable users of the rights of way; indeed, the Cities' own submissions indicate that the bonds have been set in a radically different manner than those required of others and that Pacific Bell is required to post no bonds at all for concededly comparable "very substantial burdens and disruptions." Zaner Declaration I at 4. Nor have the Cities raised a question of material fact with respect to whether cable operators' use of the public ways has a special characteristic or is sufficiently different from others' use such that a spe-

---

**42.** This is true even if government's interest is defined narrowly as being in raising revenue from the use of government property interests in public rights of way rather than defined simply as being in raising revenue generally. Other first amendment considerations aside, a nondiscriminatory rent on all comparable users of the rights of way would raise *more* revenue without creating first amendment concerns. *See, e.g., Minneapolis Star,* 460 U.S. at 586, 103 S.Ct. at 1372.

**43.** Although no party has raised the argument, and it thus is not before the Court, it perhaps might be argued that although the Cities con-

cededly do not charge Pacific Bell or PG & E as much or more rent for its comparable use of the public rights of way, this is not discriminatory because another government entity, presumably the state, does. Therefore, the argument would go, the Cities' charge is not discriminatory because government, albeit at different levels, is charging all users without discrimination. Even if such an argument had been made in this case, however, the Supreme Court forcefully rejected this type of defense in *Minneapolis Star,* 460 U.S. at 588–90, 103 S.Ct. at 1373–74, and it would not appear to be open to this Court to sustain the Cities' franchise fee on this basis.

cial scheme of bonding is justified. *See* Defendants' Declaration of George Bagdon of October 2, 1987, at 2–4, Exhibits A, B; Zaner Declaration I at 4; Defendants' Declaration of Larry Starr of October 2, 1987, at 2–3, Exhibit A; Defendants' Declaration of Steven L. Mayer of October 2, 1987, at 2, Exhibit B at 7–8.

Accordingly, plaintiff is entitled to judgment on this financial requirement as it currently exists. This ruling does not, of course, prevent the Cities from hereafter enacting and enforcing nondiscriminatory bonding requirements for purposes such as those mentioned above.

### III

### SECURITY FUND

Defendants' so-called security fund requirement is apparently intended to serve essentially as a guaranteed account of plaintiff's assets from which defendants can draw sums to compensate for a wide variety of failures by plaintiff to abide by the franchise program. *See, e.g.,* City Ordinance No. 3744, 17.2–.3 (Mar. 9, 1987); Defendants' Supplemental Memorandum at 9; Zaner Declaration II at 3–4. Unfortunately, it remains unclear how the function of the fund with respect to some of these possible failures, such as timely to complete construction or to perform franchise duties, differs from the asserted function of the construction and performance bonds. *See, e.g.,* City Ordinance No. 3744, §§ 17.2.-02, 17.3.01, 17.3.03. It is clear, however, that the security fund suffers from the same defects as the bond requirement. Here the Cities have not even attempted to raise a question of material fact as to whether cable operators' use of the public ways is sufficiently different from that of other users so as to justify singling them out with a security fund requirement. Plaintiff is therefore entitled to summary judgment as to this financial requirement.

### IV

### ADMINISTRATIVE COSTS

It is undisputed that the Cities may recover the reasonable expenses of their administration of the public rights of way.

However, as defendants concede, Tr. at 25, the Cities cannot charge for costs related to unconstitutional portions of the cable franchising program.

Given that the administrative costs the Cities seek to recover are entirely for fees for outside consultants that helped formulate the franchising program, *e.g.,* Zaner Declaration I at 2–3, and that the Court has invalidated what appears to be the bulk of that program, presumably only a much reduced portion of these costs can be recovered from plaintiff. However, on the present inadequate state of the record, *see, e.g.,* Defendants' Declaration of Jeanne Moulton of October 2, 1987, at 3–5, Exhibit E, it is impossible to ascertain what that amount is, and the Court therefore cannot grant summary judgment in favor of either party with respect to this financial requirement.

### CONCLUSION

In conclusion, plaintiff's motions for partial summary judgment are granted in part and denied in part as discussed above. Defendants' motions for partial summary judgment are denied. A status conference is hereby set for November 1, 1988, at 4:00 p.m.

IT IS SO ORDERED.